UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| STATE OF NEW YORK and JAMES V. MCDONALD, as COMMISSIONER of the NEW YORK STATE DEPARTMENT OF HEALTH, | 24 Civ. 4783 |
| Plaintiffs-Intervenors, | **CONSENT DECREE** |
| -v- | |
| WESTCHESTER JOINT WATER WORKS, TOWN/VILLAGE OF HARRISON, VILLAGE OF MAMARONECK, and TOWN OF MAMARONECK, | |
| Defendants. | |

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _09/23/2024_

# TABLE OF CONTENTS

I.      JURISDICTION AND VENUE ...........................................................................1
II.     APPLICABILITY ............................................................................................2
III.    DEFINITIONS ................................................................................................2
IV.     OBJECTIVES .................................................................................................6
V.      ADMISSIONS .................................................................................................6
VI.     CIVIL PENALTY ...........................................................................................7
VII.    INJUNCTIVE RELIEF: FILTRATION PLANT ............................................10
VIII.   INJUNCTIVE RELIEF: INTERIM MEASURES ..........................................13
IX.     INJUNCTIVE RELIEF: MUNICIPAL DEFENDANTS .................................15
X.      SUPPLEMENTAL ENVIRONMENTAL PROJECT .......................................17
XI.     REPORTING AND MEETING REQUIREMENTS .........................................18
XII.    STIPULATED PENALTIES ...........................................................................20
XIII.   FORCE MAJEURE .........................................................................................25
XIV.    DISPUTE RESOLUTION ..............................................................................26
XV.     INFORMATION COLLECTION AND RETENTION ......................................28
XVI.    EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS...........................29
XVII.   COSTS ..........................................................................................................30
XVIII.  NOTICES ......................................................................................................31
XIX.    EFFECTIVE DATE ........................................................................................34
XX.     RETENTION OF JURISDICTION .................................................................34
XXI.    MODIFICATION ............................................................................................34
XXII.   TERMINATION .............................................................................................34
XXIII.  PUBLIC PARTICIPATION ............................................................................35
XXIV.   SIGNATORIES/SERVICE .............................................................................35
XXV.    INTEGRATION ..............................................................................................35
XXVI.   26 U.S.C. § 162(F)(2)(A)(II) IDENTIFICATION ...........................................36
XXVII.  HEADINGS ...................................................................................................36
XXVIII. FINAL JUDGMENT .......................................................................................36
XXIX.   APPENDICES ...............................................................................................36

WHEREAS, Plaintiff the United States of America ("United States"), on behalf of the United States Environmental Protection Agency ("EPA"), filed a Complaint (the "Complaint") against Westchester Joint Water Works ("WJWW"), the Town/Village of Harrison, the Village of Mamaroneck, and the Town of Mamaroneck (the "Municipal Defendants" and, collectively with WJWW, "Defendants") alleging that Defendants have violated and continue to violate the Safe Drinking Water Act ("SDWA" or the "Act"), 42 U.S.C. § 300f *et seq.*, EPA's Stage 2 Disinfectants and Disinfection Byproducts Rule ("Stage 2 DBPR"), and an EPA administrative order;

WHEREAS, the Complaint alleges that Defendants failed to ensure that the water system (the "WJWW Water System") owned and operated by Defendants, which supplies drinking water to approximately 120,000 Westchester residents, complies with federal limits for certain disinfection byproducts, specifically for five regulated haloacetic acids ("HAA5"), and have failed to implement necessary corrective actions, including building a filtration plant required by an EPA administrative order, to ensure long-term protection for recipients of WJWW's water;

WHEREAS, Plaintiff-Intervenors State of New York and the Commissioner of the New York State Department of Health (collectively, the "State") filed a Complaint in Intervention (the "Complaint-in-Intervention") in this action alleging that WJWW has violated and continues to violate the state Public Health Law, implementing regulations in the State Sanitary Code, and a judgment entered in state Supreme Court, Westchester County, for failure to construct and operate a filtration plant;

WHEREAS, the United States, the State, and Defendants (collectively, the "Parties") recognize, and the Court by entering this Consent Decree finds, that this Consent Decree has been negotiated by the Parties in good faith and will avoid litigation among the Parties; that this Consent Decree is a fair and reasonable settlement of the claims asserted by the United States, as specifically set forth in the Complaint; that the Consent Decree is a fair and reasonable settlement of the claims asserted by the State, as set forth in the Complaint-in-Intervention; and that this Consent Decree is fair, reasonable, and in the public interest;

NOW, THEREFORE, with the consent of the Parties, it is hereby ORDERED, ADJUDGED, and DECREED as follows:

## I.   JURISDICTION AND VENUE

1.      This Court has jurisdiction over the subject matter of the Complaint pursuant to 42 U.S.C. § 300g-3(b) and 28 U.S.C. §§ 1331, 1345 and 1355, and personal jurisdiction over all the parties to this action.  This Court has supplemental jurisdiction over the Complaint-in-Intervention pursuant to 28 U.S.C. § 1367.

2.      Venue is proper pursuant to 28 U.S.C. §§ 1391(b) and (c) and 1395(a) because Defendants reside and are located in this District, and the violations alleged in the Complaint and Complaint-in-Intervention occurred in, and Defendants conduct business and are found in, this District.

3.      For purposes of this Consent Decree, or any action or proceeding to enforce this Consent Decree, Defendants consent to venue in the Southern District of New York and to this

Court's jurisdiction over this Consent Decree, over any such action or proceeding, and over Defendants.

4.    For purposes of this Consent Decree, Defendants agree that the Complaint states a claim upon which relief may be granted pursuant to the SDWA, 42 U.S.C. § 300g-3(b), and that the Complaint-in-Intervention states a claim upon which relief may be granted pursuant to New York Public Health Law §§ 225, 228 and 229 and Part 5, Subpart 5.1 of the State Sanitary Code, 10 New York Codes, Rules and Regulations ("N.Y.C.R.R.") §§ 5-1.1 to 5-1.100.

## II.    APPLICABILITY

5.    The obligations of this Consent Decree apply to and are binding upon the United States and the State and upon Defendants, and any successors, assigns, or other entities or persons otherwise bound by law.

6.    No transfer of ownership or operation of WJWW or the WJWW Water System, or any part thereof, whether in compliance with the procedures of this Paragraph or otherwise, shall relieve Defendants of their obligation to ensure that the terms of the Consent Decree are implemented.  At least 30 Days prior to such transfer, Defendants shall provide a copy of this Consent Decree to the proposed transferee and shall simultaneously provide written notice of the prospective transfer, together with a copy of the proposed written agreement, to the United States, EPA, and the State, in accordance with Section XVIII (Notices).  Any attempt to transfer ownership or operation of WJWW or the WJWW Water System without complying with this Paragraph constitutes a violation of this Decree.

7.    Defendants shall provide a copy of this Consent Decree to all officers, employees, and agents whose duties might reasonably include compliance with any provision of this Decree, as well as to any contractor retained to perform work required under this Consent Decree. Defendants shall condition any such contract upon performance of the work in conformity with the terms of this Consent Decree.

8.    In any action to enforce this Consent Decree, no Defendant shall raise as a defense the failure of any of its board members, officers, employees, agents, or contractors to take any actions necessary to comply with the provisions of this Consent Decree; however, nothing in this Paragraph shall limit the scope of the provisions of Section XIII (Force Majeure).

## III.    DEFINITIONS

9.    Terms used in this Consent Decree that are defined in the SDWA or in regulations promulgated pursuant to the Act, including but not limited to the Stage 2 DBPR, have the meanings assigned to them in the Act or such regulations, unless otherwise provided in this Decree.  Whenever the terms set forth below are used in this Consent Decree, the following definitions apply:

a.    "Complaint" shall mean the complaint filed by the United States in this action;

b.    "Complaint-in-Intervention" shall mean the complaint in intervention filed by the State in this action;

c.     "Consent Decree" or "Decree" shall mean this Consent Decree and all appendices attached hereto (listed in Section XXIX), and all modifications made effective in accordance with Section XXI.

d.     "Contractor Permits" shall mean the filings, permits and approvals to be obtained by the Filtration Plant construction contractor.  These are anticipated to include the following: (i) EPA – Spill Prevention, Control and Countermeasure Plan; (ii) New York State Department of Environmental Conservation – Waste Transporter Permit and EPA Identification Number; (iii) New York State Department of Environmental Conservation – Hazardous Substance Bulk Storage Registration (Chemical Bulk Storage Registration) and Petroleum Bulk Storage (Petroleum Bulk Storage Registration); (iv) New York State Department of Transportation – Divisible Load Overweight Permit (Form PERM 92) Restricted Vehicle permit; (v) New York State Department of Transportation – Special Hauling Permit (Form PERM 39-1 or 39-2); (vi) New York State Department of Labor – Inspection Request for Boiler; (vii) WCDOH – Backflow Prevention Device Approval; (viii) Town/Village of Harrison Building Department – Fire Safety Inspection; (ix) Town/Village of Harrison Building Department – Operating Permit; (x) Town/Village of Harrison Building Department – Electrical Permits; (xi) Town/Village of Harrison Building Department – Plumbing Permits; (xii) Town/Village of Harrison Building Department – Temporary Structure/Temporary Storage/Construction Debris Permit; (xiii) Town/Village of Harrison Building Department – Truck Permit; and (xiv) Town/Village of Harrison Building Department – Application for Certificate of Occupancy.

e.     "County" shall mean the County of Westchester, New York, and any successors or assigns.

f.     "Date of Lodging" shall mean the date this Consent Decree is filed for lodging with the Clerk of the Court for the United States District Court for the Southern District of New York.

g.     "Day" shall mean a calendar day unless expressly stated to be a business day. In computing any period of time under this Consent Decree, where the last day would fall on a Saturday, Sunday, or federal holiday, the period shall run until the close of business of the next business day.

h.     "Defendants" shall mean the WJWW, the Town/Village of Harrison, the Village of Mamaroneck, and the Town of Mamaroneck, and any successors or assigns.

i.     "Documents" shall be defined in accordance with Local Civil Rule 26.3 of the Local Rules of the United States District Court for the Southern District of New York.

j.     "Effective Date" shall have the definition provided in Section XIX.

k.     "EPA" shall mean the United States Environmental Protection Agency and any of its successor departments or agencies.

3

l.      "HAA5" shall mean the following five haloacetic acids: monochloroacetic acid, dichloroacetic acid, trichloroacetic acid, monobromoacetic acid, and dibromoacetic acid.

m.      "Filtration Plant" refers to a plant providing for filtration and disinfection of all water from Rye Lake entering into the WJWW Water System drinking water distribution system with the "best available technology" for achieving compliance with the maximum contaminant levels for disinfection byproducts and with all applicable requirements of Part 5, Subpart 5.1 of the State Sanitary Code, 10 N.Y.C.R.R. §§ 5-1.1 to 5-1.100.

n.      "LRAA" shall mean "locational running annual averages" as defined in the Stage 2 DBPR, 40 C.F.R. § 141.620.

o.      "MCL" shall mean a maximum contaminant level under the SDWA.

p.      "Municipal Cost Share for the Town/Village of Harrison" shall mean 55.6 percent (the percentage calculated by dividing the gallons of water supplied by WJWW within the Town/Village of Harrison by the gallons of water supplied by WJWW within the Municipal Defendants, as recited in the WJWW Resolution approved December 17, 2019).

q.      "Municipal Cost Share for the Town of Mamaroneck" shall mean 16.7 percent (the percentage calculated by dividing the gallons of water supplied by WJWW within the Town of Mamaroneck, not including the Village of Mamaroneck, by the gallons of water supplied by WJWW within the Municipal Defendants, as recited in the WJWW Resolution approved December 17, 2019).

r.      "Municipal Cost Share for the Village of Mamaroneck" shall mean 27.7 percent (the percentage calculated by dividing the gallons of water supplied by WJWW within the Village of Mamaroneck by the gallons of water supplied by WJWW within the Municipal Defendants, as recited in the WJWW Resolution approved December 17, 2019).

s.      "Municipal Defendants" shall mean the Town/Village of Harrison, the Village of Mamaroneck, and the Town of Mamaroneck.

t.      "Notice to Proceed" shall mean written notice from WJWW and/or Defendants to the persons responsible for construction of the Filtration Plant.

u.      "NYSDOH" shall mean the New York State Department of Health and any of its successor departments or agencies.

v.      "Paragraph" shall mean a portion of this Consent Decree identified by an Arabic numeral.

w.      "Parties" shall mean the United States, the State, and Defendants.

x.      "Plaintiffs" shall mean the United States and the State.

y.      "Public Health Law" shall mean the New York Public Health Law §§ 1 to 5003.

z.      "SDWA" shall mean the Safe Drinking Water Act, 42 U.S.C. §§ 300f to 300j-27.

aa.     "Section" shall mean, except when citing a provision of the SDWA or other statute or regulation, a portion of this Consent Decree identified by a Roman numeral.

bb.     "Site Preparation" shall mean the first construction contract(s) or phase(s) for the Filtration Plant.  Site Preparation shall, unless not needed for the Filtration Plant, include provision of temporary construction management facilities (such as trailers, offices, fencing and site security); construction of temporary service and access roads; site clearing and grubbing; demolition and removal of existing structures; rough grading; and provision of temporary electrical and other utilities.

cc.     "Stage 2 DBPR" shall mean the Stage 2 Disinfectants and Disinfection Byproducts Rule, 71 Fed. Reg. 388, 394 (Jan. 4, 2006) (codified in scattered sections of 40 C.F.R.).

dd.     "State" means the State of New York and the Commissioner of the New York State Department of Health.

ee.     "State Court Judgment" shall mean the Judgment on Severed First Cause of Action of the New York State Supreme Court for Westchester County dated June 9, 2004, in the civil action *State of New York and Antonia C. Novello, M.D., M.P.H., in her capacity as Commissioner of the New York State of Health v. Westchester Joint Water Works*, Index No. 13364-99.

ff.     "State Sanitary Code" shall mean the NYSDOH regulations codified at 10 N.Y.C.R.R. §§ 1.1 to 24-2.3.

gg.     "TTHM" shall mean total trihalomethanes, including the following trihalomethanes: chloroform, bromodichloromethane, dibromochloromethane, and bromoform.

hh.     "WCDOH" shall mean the Westchester County Department of Health.

ii.     "WJWW" shall mean Westchester Joint Water Works, a joint municipal water works formed as a public benefit corporation pursuant to New York State law.

jj.     "WJWW Water System" means the public water system, as defined in 42 U.S.C. § 300f(4)(A) and 10 N.Y.C.R.R. § 5-1.1(cb), owned and/or operated by Defendants.

kk.     "United States" shall mean the United States of America, acting on behalf of EPA.

## IV.    OBJECTIVES

10.    The objectives of this Consent Decree are to ensure compliance with the SDWA, the Stage 2 DBPR, and the State Sanitary Code, a prior EPA administrative order, and prior state court orders, by (i) causing the construction and subsequent continuous operation of a Filtration Plant treating all Rye Lake source water entering the WJWW Water System; (ii) implementing other measures to address non-compliance with federal and state law and to protect the public health pending commencement of operation of the Filtration Plant; (iii) implementing measures required to comply with the State Court Judgment; and (iv) resolving the civil claims of the Plaintiffs as provided in Section XVI (Effect of Settlement/Reservation of Rights).

## V.    ADMISSIONS

11.    Defendants admit, acknowledge, and accept responsibility for the following facts:

a.    The WJWW Water System supplies drinking water directly to approximately 60,000 individuals in the Town/Village of Harrison, the Village of Mamaroneck, and the Town of Mamaroneck, as well as portions of the City of Rye and the City of New Rochelle.  The WJWW Water System also indirectly supplies drinking water to an additional approximately 60,000 residents of the Village of Larchmont, the City of Rye, the Village of Rye Brook, and the Village of Port Chester.

b.    The WJWW Water System is a "public water system" and also a "community water system" under the SDWA and the State Sanitary Code.  The WJWW Water System consists of the joint system of water works and three local water supply systems that convey and distribute the water each municipality receives from the joint system of water works.  The WJWW Board of Trustees, which is composed of the chief elected official of each of the Municipal Defendants, exercises management and control over WJWW and the WJWW Water System.

c.    Under section 6124(2) of the Unconsolidated Laws of the State of New York, WJWW owns and operates the joint system of water works.  Under section 6135 of the Unconsolidated Laws of the State of New York, each Municipal Defendant owns the local water supply system that conveys and distributes the water within that municipality. WJWW operates each local water supply system on behalf of the Municipal Defendants. The cost of constructing, acquiring and operating WJWW Water System is apportioned among the Municipal Defendants in accordance with section 6130(1) of the Unconsolidated Laws of the State of New York.

d.    EPA has set the Maximum Contaminant Level for the five regulated disinfectant byproducts known as HAA5 at the level of 0.060 mg/L.

e.    In the first, second, and third quarters of 2019, the WJWW Water System contained water with levels of HAA5 in excess of 0.060 mg/L, as determined by testing performed by WJWW and reported to EPA.

f.    EPA issued an administrative order dated November 26, 2019, which required, among other things, that WJWW ensure the WJWW Water System's

compliance with the Stage 2 DBPR, by constructing and operating a filtration plant by certain milestone dates. The administrative order required construction to commence by January 1, 2022.

g.      New York State's State Sanitary Code separately requires WJWW to construct and operate a filtration plant, 10 N.Y.C.R.R. § 5-1.30(b), as does the State Court Judgment issued in 2004 by the New York State Supreme Court for Westchester County.

h.      WJWW has not yet commenced construction of, and does not operate, a filtration plant.

## VI.    CIVIL PENALTY

12.     Within 60 Days after the Effective Date, WJWW shall pay to the United States the sum of $600,000 as a civil penalty, together with interest accruing from the date on which the Consent Decree is lodged with the Court at the rate specified in 28 U.S.C. § 1961 as of the Date of Lodging. Without limiting WJWW's obligations under this Consent Decree, including in the prior sentence:

a.      The Town/Village of Harrison shall provide the necessary funds to WJWW in accordance with the Municipal Cost Share for the Town/Village of Harrison no later than 10 days prior to the date that WJWW is required to make such civil penalty payment.

b.      The Town of Mamaroneck shall provide the necessary funds to WJWW in accordance with the Municipal Cost Share for the Town of Mamaroneck no later than 10 days prior to the date that WJWW is required to make such civil penalty payment.

c.      The Village of Mamaroneck shall provide the necessary funds to WJWW in accordance with the Municipal Cost Share for the Village of Mamaroneck no later than 10 days prior to the date that WJWW is required to make such civil penalty payment.

13.     WJWW (or other Defendants, as applicable, in the case of any stipulated penalties) shall pay the civil penalty due to the United States by FedWire Electronic Funds Transfer ("EFT"), in accordance with instructions provided to Defendants by the United States Attorney's Office for the Southern District of New York after the Effective Date. The payment instructions will include a Consolidated Debt Collection System ("CDCS") number, which Defendants shall use to identify all payments required to be made in accordance with this Consent Decree.

14.     At the time of payment, WJWW (or other Defendants, as applicable, in the case of any stipulated penalties) shall send notice that payment has been made: (i) to EPA via email at cinwd_acctsreceivable@epa.gov or via regular mail at EPA Cincinnati Finance Office, 26 W. Martin Luther King Drive, Cincinnati, Ohio 45268; (ii) to DOJ via email or regular mail in accordance with Section XVIII; and (iii) to EPA in accordance with Section XVIII. Such notice shall state that the payment is for the civil penalty owed pursuant to the Consent Decree in *United States v. Westchester Joint Water Works et al.*, and shall reference the civil action number, CDCS Number and DOJ case number 90-5-1-1-12441.

15.    Within 60 Days after the Effective Date, WJWW shall pay to the State the sum of $650,000 as a civil penalty, together with interest accruing from the date on which the Consent Decree is lodged with the Court, at the rate specified in 28 U.S.C. § 1961 as of the Date of Lodging. Without limiting WJWW's obligations under this Consent Decree, including in the prior sentence:

      a.    The Town/Village of Harrison shall provide the necessary funds to WJWW in accordance with the Municipal Cost Share for the Town/Village of Harrison no later than 10 days prior to the date that WJWW is required to make such civil penalty payment.

      b.    The Town of Mamaroneck shall provide the necessary funds to WJWW in accordance with the Municipal Cost Share for the Town of Mamaroneck no later than 10 days prior to the date that WJWW is required to make such civil penalty payment.

      c.    The Village of Mamaroneck shall provide the necessary funds to WJWW in accordance with the Municipal Cost Share for the Village of Mamaroneck no later than 10 days prior to the date that WJWW is required to make such civil penalty payment.

16.    The civil penalty payable to the State shall be paid by check made payable to "New York State Department of Health" and mailed to Andrew Frank, Assistant Attorney General, Environmental Protection Bureau, 28 Liberty Street, 19th Floor, New York, New York 10005.  The cover letter and check shall state that the payment is for the civil penalty owed pursuant to the Consent Decree in *United States v. Westchester Joint Water Works et al.*, and shall reference the civil action number.

17.    In addition, WJWW shall spend a total of at least $6,800,000 on two water quality benefit projects (the "Benefit Projects").  The Benefit Projects shall not be projects that, as of the time this Consent Decree is lodged with the Court, Defendants are otherwise legally required to implement, plan to implement independent of this Consent Decree, or have funded in their current budgets; provided, however, that the Lead Service Line Replacement Program pursuant to Paragraph 17.b below is not subject to this sentence.  For the avoidance of doubt, nothing in this Consent Decree prohibits the Defendants from funding the cost of the Benefit Projects, or the debt service associated therewith, from water customer revenue.  The Benefit Projects are: (i) a new water main to the Quarry Heights neighborhood of the Town of North Castle (the "Quarry Heights Project"), as described in Appendix A, and (ii) the establishment of a Lead Service Line Replacement Program (the "Lead Service Line Replacement Program").

      a.    The Defendants' obligations with respect to the Quarry Heights Project shall be satisfied when WJWW deposits $1,100,000 into a segregated account to be used exclusively for the Quarry Heights Project.

      b.    The Defendants' obligations with respect to the Lead Service Line Replacement Program shall be satisfied when: (i) the Defendants submit a detailed plan to the State (to be submitted within six months of the Effective Date) describing a proposed Lead Service Line Replacement Program, including its funding criteria, administrative mechanisms, and implementation schedule; (ii) the State issues a written approval of such plan, as the same may be modified in accordance with discussions between the State and

8

Defendants; (iii) WJWW deposits the sum of $5,700,000 into a segregated account to be used for the Lead Service Line Replacement Program, or, if required under Paragraph 18 below, the Additional Benefit Project (as defined in Paragraph 18 below) and/or the Benefit Difference Payment (as defined in paragraph 18 below); and (iv) the monies in such account are paid out to fund the Lead Service Line Replacement Program, or, if required under Paragraph 18 below, to fund the Additional Benefit Project (as defined in paragraph 18 below) and/or the Benefit Difference Payment (as defined in paragraph 18 below). The plan shall provide for preparation and completion of both (x) a Lead Service Line Inventory of all service connections within the WJWW service area and (y) an on-line, publicly accessible map of the entire service area depicting the inventory results. Among the factors the State will consider positively in deciding whether to approve the Lead Service Line Replacement Program is the extent to which that Program includes outreach to ensure owners and occupants of residences owned or occupied by low-income residents are aware of the Program, and other measures to target such owners and occupants for participation in the Program.

18.    WJWW shall provide the State with an accounting of the amount spent on the Benefit Projects within 60 Days of project completion. In the event the Benefit Projects are not completed within six years of the effective date or are completed within six years of the effective date for less than $6,800,000, WJWW shall propose an additional water quality benefit project (the "Additional Benefit Project") and a schedule for implementing the Additional Benefit Project for approval by the State. The Additional Benefit Project shall require WJWW to expend at least the difference between $6,800,000 and the amount spent by WJWW on the Benefit Projects. If the State approves the Additional Benefit Project, WJWW shall implement the Additional Benefit Project as approved by the State and shall expend the funds for the Additional Benefit Project within three years of the date of State approval or by any later date WJWW and the State agree upon. If the State disapproves the Additional Benefit Project, the Defendants and the State agree to meet and discuss the Additional Benefit Project or any other water quality benefit project that either WJWW or the State proposes. If the Defendants and the State cannot reach agreement on a water quality benefit project that requires WJWW to expend at least the difference between $6,800,000 and the amount spent on the Benefit Projects within 60 Days of the State's disapproval, or such additional time as WJWW and State agree upon, the State may provide WJWW written notice directing WJWW to pay the difference between $6,800,000 and the amount spent by WJWW on the Benefit Projects to the State (the "Benefit Difference Payment"), and WJWW shall make the Benefit Difference Payment within 45 Days of WJWW's receipt of such written notice following the same payment process as set forth in Paragraph 16 above.

19.    The Defendants agree that in any public communication regarding the Benefit Projects or any Additional Benefit Project, Defendants shall include language noting that the Benefit Projects or the Additional Benefit Project are/is being performed in lieu of a portion of a penalty for violation of a judgment against Defendants obtained by the State.

20.    Failure to meet deadlines for the Benefit Projects or any Additional Benefit Project shall be governed by the terms of Section XII (Stipulated Penalties). Should a dispute arise between the Defendants and the State concerning any aspect of the Benefit Projects or any Additional Benefit Project, including the proposed schedule, the dispute shall be resolved by the

Defendants and the State in accordance with Section XIV (Dispute Resolution). With respect to that dispute, the State shall have the same rights and responsibilities afforded to the United States as set forth in that Section.

21.     Defendants shall not deduct any penalties paid under this Decree pursuant to this Section or Section XII (Stipulated Penalties) in calculating their federal or State income tax.

## VII.    INJUNCTIVE RELIEF: FILTRATION PLANT

22.     WJWW shall construct, commence operation of, and thereafter continuously operate a Filtration Plant as provided in this Section.

A.    <u>Filtration Plant Deadlines</u>

23.     Subject to Paragraph 33 and Section XIII (Force Majeure), by October 8, 2024, WJWW shall obtain all approvals from the Town/Village of Harrison Planning Board required under the local land use review procedure for the Filtration Plant.

24.     Subject to Paragraph 33 and Section XIII (Force Majeure), by November 8, 2024, WJWW shall complete and submit to the appropriate authorities all applications for all necessary local, state, and federal approvals and permits for the Filtration Plant, other than the applications for the Contractor Permits. By this date, Defendants shall submit all information necessary to process the applications and take all actions necessary to obtain all such permits or approvals.

25.     Subject to Paragraph 33 and Section XIII (Force Majeure), by March 8, 2025, WJWW shall secure all necessary local, state, and federal final approvals and permits (excluding NYSDOH approvals and the Contractor Permits) for the Filtration Plant. If any other reviews or approvals are identified by Defendants at a later date that are required to satisfy the requirements of Westchester County and/or any other local, state, or federal agency with authority to review the land acquisition arrangements, Defendants shall notify EPA and the State in accordance with Section XVIII (Notices) within 5 Days of Defendants' identification of such requirements.

26.     Subject to Paragraph 33 and Section XIII (Force Majeure), WJWW shall complete the acquisition of the site selected for construction of the Filtration Plant by April 20, 2025, and shall submit proof of the acquisition to the EPA and the State within 30 Days of such acquisition.

27.     By May 1, 2025, WJWW shall advertise for bids for construction of the Filtration Plant.

28.     By September 2, 2025, WJWW shall award the contract to construct the Filtration Plant.

29.     Subject to Paragraph 33 and Section XIII (Force Majeure), by August 4, 2025, WJWW shall also identify and submit to EPA and the State a proposed schedule of Additional Milestones, for the period between August 4, 2025, and the date for commencing operations of the Filtration Plant set forth in Paragraph 32 below. The Additional Milestones shall be established through the process set forth in Paragraphs 36 through 41. Once the final Additional

Milestones have been approved pursuant to Paragraph 36(a) or established through the dispute resolution procedures set forth in Section XIV (Dispute Resolution), such Additional Milestones shall be incorporated into this Consent Decree as "Schedule A" as soon as possible, which Schedule shall be filed on the Court's docket no later than 60 Days after the Additional Milestones have been approved or determined.

30.     The Additional Milestones required in Paragraph 29 shall be scheduled to occur at sufficient frequencies to ensure EPA's and the State's ability to maintain oversight and to ensure compliance with the deadlines set forth in Paragraphs 31 and 32. The Additional Milestones shall identify or state:

a.     Each phase of construction, with each phase to include, but not be limited to, a separate milestone for: (i) completion of final design; (ii) securing of necessary approval(s) of plans and specifications from NYSDOH, with a milestone for submission of a complete application to NYSDOH; (iii) advertisement for bids; (iv) issuance of a Notice to Proceed; and (v) completion of construction;

b.     A milestone for a Notice to Proceed for commencement of construction of the building or structure that will contain the filtration process, with such notice to be provided as early as practicable in the construction schedule;

c.     The phase(s) in which the installation will be accomplished for the various selected types of filtration and disinfection units and the construction of all other selected components of the Filtration Plant; and

d.     The technical justification for the proposed schedule of Additional Milestones.

31.     By March 1, 2029, WJWW shall complete construction of all Filtration Plant facilities necessary for startup of the Filtration Plant (hereinafter, "substantial construction") and commence startup and testing of the Filtration Plant.

32.     By July 1, 2029, WJWW shall commence operation of the Filtration Plant in compliance with the filtration, disinfection, monitoring, and reporting requirements set forth at 40 C.F.R. part 141, Subparts H, P, and W, and all applicable provisions of Part 5, Subpart 5.1 of the State Sanitary Code, 10 N.Y.C.R.R. §§ 5-1.1 to 5-1.100, and shall continue to comply with all such provisions thereafter.

33.     Defendants may seek relief under the provisions of Section XIII (Force Majeure) for any failure to timely perform any obligation of this Consent Decree where such failure resulted from a failure to obtain, or a delay in obtaining, any permit or approval required to fulfill such obligation, if the requirements for relief under Section XIII are otherwise satisfied.

B.     Environmental Justice; Impacts During Construction

34.     Prior to commencing construction of the Filtration Plant, WJWW shall evaluate any potential adverse impacts of such construction and other actions undertaken pursuant to this Consent Decree, including to the extent to which these impacts affect already overburdened and underserved populations. WJWW shall schedule at least one public meeting to inform the public

of any such potential adverse impacts, and provide an opportunity to members of the public to provide verbal comments, as well as to submit comments in writing identifying any such adverse impacts. Defendants shall ensure that such meeting is accessible to all who wish to attend, including through the use of technology as appropriate.

35.    WJWW shall mitigate any such potential adverse impacts of construction and other actions undertaken pursuant to this Consent Decree, including impacts on overburdened and underserved populations, to the maximum extent practicable consistent with construction of a Filtration Plant.

C.    Approval of Deliverables

36.    After review of any plan, report, or other item that is required to be submitted to EPA for approval pursuant to Paragraph 29 of this Consent Decree (Additional Milestones), EPA, after consultation with the State, shall in writing: (a) approve the submission; (b) approve the submission upon specified conditions; (c) approve part of the submission and disapprove the remainder; or (d) disapprove the submission.

37.    If the submission is approved pursuant to Paragraph 36(a), Defendants shall take all actions required by the plan, report, or other document, in accordance with the schedules and requirements of the plan, report, or other document, as approved.  If the submission is conditionally approved or approved only in part pursuant to Paragraph 36(b) or (c), Defendants shall, upon written direction from EPA after consultation with the State, take all actions required by the approved plan, report, or other item that EPA, after consultation with the State, determines are technically severable from any disapproved portions, subject to Defendants' right to dispute only the specified conditions or the disapproved portions, under Section XIV (Dispute Resolution).

38.    If the submission is disapproved in whole or in part pursuant to Paragraph 36(c) or (d), Defendants shall, within 45 Days or such other time as the Parties agree to in writing, correct all deficiencies and resubmit the plan, report, or other item, or disapproved portion thereof, for approval, in accordance with the preceding Paragraphs.  If the resubmission is approved in whole or in part, Defendants shall proceed in accordance with the preceding Paragraph.

39.    If a resubmitted plan, report, or other item, or portion thereof, is disapproved in whole or in part, EPA, after consultation with the State, may again require Defendants to correct any deficiencies, in accordance with the preceding Paragraphs, or may itself/themselves correct any deficiencies, subject to Defendants' right to invoke Dispute Resolution and the right of the United States and the State to seek stipulated penalties as provided in Paragraphs 40 and 41.

40.    If Defendants elect to invoke Dispute Resolution as set forth in Section XIV (Dispute Resolution), Defendants shall do so by sending a Notice of Dispute in accordance with Paragraph 104 within 45 Days (or such other time as the Parties agree to in writing) after receipt of the applicable decision.

41.     Any stipulated penalties applicable to the original submission, as provided in Section XII (Stipulated Penalties), accrue during the 45 Day period or other specified period, but shall not be payable unless the resubmission is untimely or is disapproved in whole or in part; provided that, if the original submission was so deficient as to constitute a material breach of Defendants' obligations under this Decree, the stipulated penalties applicable to the original submission shall be due and payable notwithstanding any subsequent resubmission.

## VIII.   INJUNCTIVE RELIEF: INTERIM MEASURES

42.     Until WJWW has complied with all the requirements set forth in Section VII, WJWW shall implement the following Interim Measures set forth in this Section.

A.     <u>On-Going Stage 2 Compliance Activities</u>

43.     WJWW shall remain in compliance with the TTHM and HAA5 monitoring requirements, methodology requirements, and reporting requirements of the Stage 2 DBPR.  *See* 40 C.F.R. §§ 141.620, 141.621, 141.629.

44.     WJWW shall conduct monitoring quarterly for TTHM and HAA5 in accordance with 40 C.F.R. § 141.621(a) and WJWW's approved monitoring plan.  Samples shall be analyzed in accordance with 40 C.F.R. § 141.621(b).  WJWW must calculate the LRAAs for TTHM and HAA5 using monitoring results collected in accordance with 40 C.F.R. § 141.620(d).  Specifically, WJWW must calculate compliance with the MCL based on the available data from the most recent four quarters.

45.     WJWW must comply with all public notice requirements specified in 40 C.F.R. Part 141, Subpart Q, for any TTHM or HAA5 MCL violation that occurs after the Effective Date of this Consent Decree.

46.     In addition to routine reporting to the WCDOH, WJWW shall submit to EPA the results of the TTHM and HAA5 monitoring required by this subparagraph.  WJWW shall report quarterly to EPA for the duration of this Consent Decree.  Results may be submitted with the quarterly progress reports described in Paragraph 70.  Within 14 Days after WJWW has submitted the results of the TTHM and HAA5 monitoring to EPA, WJWW shall also post the results of the monitoring on its website.

47.     If the WJWW Water System violates a TTHM or HAA5 MCL, WJWW must submit a report to EPA, WCDOH, and NYSDOH describing the operational or source water conditions believed to have contributed to the violation, actions taken or planned to mitigate the violation, and any additional monitoring performed to delineate the extent of the issue within the distribution system.

B.     <u>Distribution System Flushing</u>

48.     At all times after the Effective Date during the duration of this Decree, WJWW must implement the flushing protocol attached hereto as Appendix B.  If, at any time, WJWW wishes to make changes to the flushing protocol, it shall submit a proposed draft to EPA for approval.  EPA, in consultation with NYSDOH and WCDOH, will review the flushing protocol and, upon notification by EPA, WJWW shall implement the flushing protocol.

C.    Source Water Monitoring

49.    After the Effective Date, WJWW shall initiate a second round of source water monitoring, pursuant to 40 C.F.R. §141.701(b), that meets the requirements for monitoring parameters, frequency, and duration described in 40 C.F.R. § 141.701(a), unless WJWW meets the monitoring exemption criteria in 40 C.F.R. § 141.701(d). Source water monitoring data shall comply with 40 C.F.R. §§ 141.704 and 141.705. WJWW shall comply with its proposed monitoring plan, attached hereto as Appendix C.

50.    WJWW must report results from the source water monitoring to EPA, NYSDOH and WCDOH no later than 10 Days after the end of the first month following the month when the sample is collected. Within 14 Days after WJWW has submitted the results of the source monitoring to EPA, NYSDOH and WCDOH, WJWW shall post the results of the monitoring on its website.

D.    Disinfection

51.    At least 30 Days before making a significant change to their disinfection practice, WJWW must notify EPA, NYSDOH, and WCDOH of its intent to make a significant change to its disinfection practice and include the following information:

a.    A completed disinfection profile and disinfection benchmark for Giardia lamblia and viruses as described in 40 C.F.R. § 141.709.

b.    A description of the proposed change in disinfection practice.

c.    An analysis of how the proposed change will affect the current level of disinfection.

52.    Significant changes to disinfection practice include, but are not limited to, changes to the point of disinfection; changes to the disinfectant(s) used in the treatment plant; and changes to the disinfection process.

53.    CT Calculations. For each day the WJWW water system is in operation, the WJWW shall calculate the total inactivation ratio pursuant to the provisions of 40 C.F.R. §§ 141.74(b)(3) and (4). WJWW shall report to EPA, NYSDOH, and WCDOH the information listed at 40 C.F.R. § 141.75(a)(2) monthly, within 10 Days after the end of each month.

E.    Simultaneous Compliance

54.    A change in treatment or source may necessitate a change in Optimal Water Quality Parameter ("OWQP") specifications and corrosion control treatment. Pursuant to 40 C.F.R. § 141.90(a)(3), prior to the addition of a new source or any long-term change in water treatment, a water system must submit written documentation to NYSDOH describing the change or addition. NYSDOH must review and approve the change. Within 10 Days of the Effective Date, WJWW shall submit a report to EPA explaining what steps it is undertaking to comply with 40 C.F.R. § 141.90(a)(3) while WJWW is implementing the long-term measures set forth in Section VII.

F.    Notification

55.    Within 45 Days after the Effective Date, WJWW must provide notice in writing to its consumers, and to the owner and operator of all public water systems that purchase water from the WJWW, explaining that Defendants entered into a Consent Decree that sets forth a schedule to build a Filtration Plant for the Rye Lake source in order to install the best available technology for achieving compliance with the maximum contaminant levels for disinfection byproducts and with State law requiring filtration of drinking water taken from surface water sources.

56.    WJWW shall provide a draft of the proposed notice to EPA and NYSDOH for review and approval no later than 14 Days after the Effective Date.  EPA, in consultation with NYSDOH, shall endeavor, within 14 Days of receipt, to comment on and provide any requested modifications to the proposed notice.

57.    WJWW shall include a statement in its annual Drinking Water Quality Report until compliance with the deadlines in Section VII is achieved.  The statement shall explain that Defendants entered into a Consent Decree that sets forth a schedule to build the Filtration Plant to install the best available technology for achieving compliance with the maximum contaminant levels for disinfection byproducts and with State law requiring filtration of drinking water taken from surface water sources.

58.    Prior to commencing construction of the Filtration Plant, WJWW shall establish and maintain a website or a webpage on its website that provides the construction plan and purpose of the Filtration Plant, along with any air monitoring or stormwater mitigation that would be required by local, state, and/or federal permitting authorities for the Filtration Plant. The website or webpage shall also include, but not be limited to: (i) a copy of the Complaint, the Complaint-in-Intervention, and the Consent Decree; (ii) periodic updates on the progress of the construction of the Filtration Plant; (iii) an explanation for any delays that may occur, and steps WJWW is taking to minimize the delay; (iv) the EJ Impact Evaluation set forth in Paragraph 34; (v) a description of any mitigation efforts taken pursuant to Paragraph 35; (vi) all reports submitted to EPA and NYSDOH under this Consent Decree, including the Quarterly Reports set forth in Paragraph 70; (vii); periodic summaries of data from any monitoring that will be performed as required by local, state, and/or federal permitting authorities; and (viii) contact information for any complaints relating to the construction of the Filtration Plant.  This list of information to be provided on the website is not intended to be an exclusive one, and WJWW may, in its discretion, post other information on the website that would be useful for the public to be apprised of progress made under this Consent Decree.  WJWW shall update the website at least quarterly, with updates by January 15, April 15, July 15, and October 15 of each year.

## IX.    INJUNCTIVE RELIEF: MUNICIPAL DEFENDANTS

59.    The Municipal Defendants shall use best efforts to ensure that WJWW complies with its obligations under this Consent Decree.

60.    Without limiting WJWW's obligations under this Consent Decree, including but not limited to under Sections VI, VII, VIII, and X, the Municipal Defendants shall fund the Filtration Plant, the Benefit Projects, the Additional Benefit Project (if applicable), the Benefit Difference Payment (if applicable), and the SEP as follows:

a.      No later than 60 days after WJWW awards the contract for the construction of the Filtration Plant, the Town/Village of Harrison shall adopt a resolution and take all other actions required by law for it to issue bonds or bond anticipation notes or to commit to enter into a loan agreement with the New York State Environmental Facilities Corporation to pay for the Municipal Cost Share for the Town/Village of Harrison and shall thereafter promptly issue such bond or notes or enter into such loan agreement and provide the funds for the Filtration Plant to allow WJWW to make timely payment of invoices with regard to the Filtration Plant to allow the Filtration Plant to be constructed in accordance with the schedule required by this Consent Decree.  In addition, the Town/Village of Harrison shall provide and timely transmit such funds to WJWW, in accordance with the Municipal Cost Share for the Town/Village of Harrison, as are needed to allow WJWW to perform and/or proceed with the Benefit Projects, the Additional Benefit Project (if applicable), the Benefit Difference Payment (if applicable) and the SEP and make timely payment of any related invoices to allow these improvements or activities to be performed in accordance with any schedule(s) required by this Consent Decree.

b.      No later than 60 days after WJWW awards the contract for the construction of the Filtration Plant, the Town of Mamaroneck shall adopt a resolution and take all other actions required by law for it to issue bonds or bond anticipation notes or to commit to enter into a loan agreement with the New York State Environmental Facilities Corporation to pay for the Municipal Cost Share for the Town of Mamaroneck and shall thereafter promptly issue such bond or notes or enter into such loan agreement and provide the funds for the Filtration Plant to allow WJWW to make timely payment of invoices with regard to the Filtration Plant to allow the Filtration Plant to be constructed in accordance with the schedule required by this Consent Decree.  In addition, the Town of Mamaroneck shall provide and timely transmit such funds to WJWW, in accordance with the Municipal Cost Share for the Town of Mamaroneck, as are needed to allow WJWW to perform and/or proceed with the Benefit Projects, the Additional Benefit Project (if applicable), the Benefit Difference Payment (if applicable) and the SEP and make timely payment of any related invoices to allow these improvements or activities to be performed in accordance with any schedule(s) required by this Consent Decree.

c.      No later than 60 days after WJWW awards the contract for the construction of the Filtration Plant, the Village of Mamaroneck shall adopt a resolution and take all other actions required by law for it to issue bonds or bond anticipation notes or to commit to enter into a loan agreement with the New York State Environmental Facilities Corporation to pay for the Municipal Cost Share for the Village of Mamaroneck and shall thereafter promptly issue such bond or notes or enter into such loan agreement and provide the funds for the Filtration Plant to allow WJWW to make timely payment of invoices with regard to the Filtration Plant to allow the Filtration Plant to be constructed in accordance with the schedule required by this Consent Decree.  In addition, the Village of Mamaroneck shall provide and timely transmit such funds to WJWW, in accordance with the Municipal Cost Share for the Village of Mamaroneck, as are needed to allow WJWW to perform and/or proceed with the Benefit Projects, the Additional Benefit Project (if applicable), the Benefit Difference Payment (if applicable) and the SEP and make timely payment of any related invoices to allow these

improvements or activities to be performed in accordance with any schedule(s) required by this Consent Decree.

## X. SUPPLEMENTAL ENVIRONMENTAL PROJECT

61.    WJWW shall implement a Supplemental Environmental Project ("SEP") in accordance with this Section X and the SEP Memo annexed as Appendix D.  WJWW shall spend no less than $900,000 to implement the SEP.  The SEP shall be completed within 54 months after the Effective Date in accordance with the schedule of milestones set forth in Appendix D. The SEP shall be comprised of the project to improve the quality of storm water entering the Kensico Reservoir described in the SEP Memo annexed as Appendix D.

62.    WJWW is responsible for the satisfactory completion of the SEP in accordance with the requirements of this Decree.  WJWW may use contractors or consultants in planning and implementing the SEP.

63.    With regard to the SEP, WJWW certifies the truth and accuracy of each of the following:

a.    that all cost information provided to EPA in connection with EPA's approval of the SEP is complete and accurate and that WJWW in good faith estimates the cost to implement the SEP to be approximately $900,000, as set forth in the SEP Memo annexed as Appendix D;

b.    that as of the date of executing this Decree, Defendants are not required to perform or develop the SEP by any federal, state, or local law or regulation and are not required to perform or develop the SEP by agreement, grant, or as injunctive relief awarded in any other action in any forum;

c.    that the SEP is not a project that Defendants were planning or intending to construct, perform, or implement other than in settlement of the claims resolved in this Decree;

d.    that Defendants have not received and will not receive credit for the SEP in any other enforcement action;

e.    that Defendants will not receive any reimbursement for any portion of the SEP from any other person.  For the avoidance of doubt, fees collected from water customers do not constitute reimbursement within the meaning of this subparagraph; and

f.    that (i) Defendants are not a party to any open federal financial assistance transaction that is funding or could fund the same activity as the SEP described in Paragraph 61; and (ii) Defendants have inquired of the SEP recipient and/or SEP implementer whether either is a party to an open federal financial assistance transaction that is funding or could fund the same activity as the SEP and has been informed by the recipient and/or the implementer that neither is a party to such a transaction.  For purposes of these certifications, the term "open federal financial assistance transaction" refers to a grant, cooperative agreement, loan, federally-guaranteed loan guarantee, or

other mechanism for providing federal financial assistance whose performance period has not yet expired.

64.     SEP Completion Report.  No later than 56 months from the Effective Date, Defendants shall submit a SEP Completion Report to DOJ, EPA and the State in accordance with Section XVIII (Notices).  The SEP Completion Report shall contain the following information:

      a.     a detailed description of the SEP as implemented;

      b.     a description of any problems encountered in completing the SEP and the solutions thereto;

      c.     an itemized list of all eligible SEP costs expended;

      d.     certification that the SEP has been fully implemented pursuant to the provisions of this Decree; and

      e.     a description of the environmental and public health benefits resulting from implementation of the SEP (with a quantification of the benefits and pollutant reductions, if feasible).

65.     EPA may, in its sole discretion, require information in addition to that described in the preceding Paragraph, in order to evaluate the SEP Completion Report.

66.     After receiving the SEP Completion Report, the United States will notify Defendants whether or not WJWW has satisfactorily completed the SEP.  If WJWW has not completed the SEP in accordance with this Consent Decree, stipulated penalties may be assessed under Section XII.

67.     Each submission required under this Section shall be signed by an official with knowledge of the SEP and shall bear the certification language set forth in Paragraph 73.

68.     Any public statement, oral or written, in print, film, or other media, made by Defendants making reference to the SEP under this Decree shall include the following language: "This project was undertaken in connection with the settlement of an enforcement action, *United States v. Westchester Joint Water Works*, taken on behalf of the U.S. Environmental Protection Agency under the Safe Drinking Water Act."

69.     For federal income tax purposes, Defendants agree that they will neither capitalize into inventory or basis nor deduct any costs or expenditures incurred in performing the SEP.

## XI. REPORTING AND MEETING REQUIREMENTS

70.     Quarterly Reports.  Upon the Effective Date until the termination of this Consent Decree pursuant to Section XXII (Termination), WJWW shall submit by email to the United States, EPA, and the State, at the addresses set forth in Section XVIII (Notices), quarterly reports for the preceding Calendar Quarter on January 15, April 15, July 15, and October 15 of each year.  If the first Calendar Quarter after the Effective Date consists of 30 Days or less, the

Quarterly Report for that Calendar Quarter shall not be required, and the information will be included in the next Quarterly Report.

71.     The Quarterly Reports shall include, at a minimum:

a.      A description of the actions taken by Defendants to comply with this Consent Decree, including the completion of any obligations pursuant to Sections VII and VIII; the status of any construction or compliance measures; problems encountered or anticipated, together with implemented or proposed solutions; status of permit applications; operation and maintenance; reports to state and local agencies; a discussion of Defendants' progress in satisfying its obligations in connection with the SEP under Section X including, at a minimum, a narrative description of activities undertaken; a discussion of Defendants' progress in satisfying its obligations in connection with the Benefit Projects and any Additional Benefit Project under Paragraphs 17-20 and Appendix A, including, at a minimum, a narrative description of activities undertaken; status of any construction or compliance measures, including the completion of any milestones set forth in the SEP Memo attached as Appendix D; and a summary of costs incurred since the previous report.

b.      A description of any non-compliance with any requirements of this Consent Decree, and an explanation of the violation's likely cause and of the remedial steps taken, or to be taken, to prevent or minimize such violation, or to prevent future non-compliance. If the cause of the non-compliance cannot be fully explained at the time that the Quarterly Report is due, Defendants shall so state in their Quarterly Report. Defendants shall investigate the cause of the violation and shall then submit an amendment to the Quarterly Report, including a full explanation of the cause of the violation, within 30 Days of the Day Defendants become aware of the cause of the violation.

c.      If Defendants violate, or have reason to believe that they may violate, any requirement of this Consent Decree, Defendants shall notify the United States, EPA, and the State, of such violation and its likely duration, in writing, within 15 business Days of the Day Defendants first become aware of the violation, with an explanation of the violation's likely cause and of the remedial steps taken, or to be taken, to prevent or minimize such violation.

d.      Nothing in this Paragraph or the following Paragraph relieves Defendants of their obligation to provide the notice required by Section XIII (Force Majeure).

72.     Whenever any violation of this Consent Decree or of any applicable permits or any other event affecting the performance required of a Defendant under this Decree may pose an immediate threat to the public health or welfare or the environment, the Defendant who violated or became aware of the violation of this Consent Decree or of any applicable permit, or whose performance is required under this Consent Decree, shall notify (i) the Chief of the Water Compliance Branch for EPA Region 2 by telephone at (212) 637-4244 or by email to mckenna.douglas@epa.gov, and (ii) the State by telephone at (518) 402-7650 or by email to bpwsp@health.ny.gov as soon as possible, but no later than 24 hours after the Defendant first

knew of the violation or event. This procedure is in addition to the requirements set forth in the preceding Paragraph.

73.    Each report submitted by Defendants under this Section shall be signed by an official of the submitting party and include the following certification:

> I certify under penalty of perjury that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate, and complete. I have no personal knowledge that the information submitted is other than true, accurate, and complete. I am aware that there are significant penalties for knowingly submitting false information, including the possibility of fine and imprisonment for knowing violations.

74.    This certification requirement does not apply to emergency or similar notifications where compliance would be impractical, provided that in such instances a certification shall be provided as soon as practicable thereafter.

75.    The reporting requirements of this Consent Decree do not relieve Defendants of any reporting obligations required by the Act or implementing regulations, or by any other federal, state, or local law, regulation, permit, or other requirement.

76.    Any information provided pursuant to this Consent Decree may be used by the United States or the State in any proceeding to enforce the provisions of this Consent Decree and as otherwise permitted by law.

77.    <u>Meetings and Reviews</u>. The Parties shall meet and confer on at least a semi-annual basis on February 1 and August 1 of each year, unless the Parties agree, in writing, to less frequent progress meetings.

78.    Throughout the term of this Consent Decree, a Party may wish to discuss issues relating to the activities and the schedule of activities required by this Consent Decree, including, but not limited to, the WJWW's management plans for the Filtration Plant; appropriate treatment techniques, including emerging technologies related to filtration and disinfection; water quality issues; and changes or proposed changes in drinking water standards or other federal or state mandates. The Parties agree that, at the request of any Party, the other Parties shall discuss, at the semi-annual progress meeting as provided for in Paragraph 77 or at a separately arranged meeting, any issue or request relating to the activities and the schedule of activities required by this Consent Decree which is raised by a Party. The Parties shall send to any such meeting responsible and appropriate representatives to discuss and address the issues raised in good faith.

## XII.        STIPULATED PENALTIES

79.    Defendants shall be liable for stipulated penalties to the United States and the State for violations of this Consent Decree as specified below in this Paragraph and its subparagraphs, unless excused under Section XIII (Force Majeure). A violation includes failing

to perform any obligation required by the terms of this Decree, including any work plan or schedule approved under this Decree, according to all applicable requirements of this Decree and within the specified time schedules established or approved under this Decree.

        a.     If WJWW violates an obligation identified in this Section, it is responsible to pay the penalty for that violation.  If any Municipal Defendant(s) was (were) responsible for that violation, including by failing to use best efforts to ensure that WJWW met that obligation, such Municipal Defendant(s) is (are) jointly and severally liable for the penalty.

        b.     The Town/Village of Harrison, and not the other Defendants, shall be liable for its failure to issue the municipal bond resolution and take the other actions required by Paragraph 60(a) above.

        c.     The Town of Mamaroneck, and not the other Defendants, shall be liable for its failure to issue the municipal bond resolution and take the other actions required by Paragraph 60(b) above.

        d.     The Village of Mamaroneck, and not the other Defendants, shall be liable for its failure to issue the municipal bond resolution and take the other actions required by Paragraph 60(c) above.

        e.     The Town/Village of Harrison, and not the other Defendants, shall be liable for any stipulated penalties arising from undue delay in the review and issuance of any necessary approval that must be issued by its Town Board.

        f.     Notwithstanding the allocation of liability for stipulated penalties in Paragraph 79(a)-(e) above, each Defendant is independently obligated to perform its responsibilities under this Consent Decree, regardless of the compliance or performance of responsibilities of each other Defendant.

80.    <u>Late Payment of Civil Penalty to the United States</u>.  If WJWW and/or the Municipal Defendants (as applicable pursuant to Paragraph 79) fails to pay the civil penalty required to be paid to the United States under Paragraph 12 of Section VI (Civil Penalty) when due, WJWW and/or the Municipal Defendants (as applicable pursuant to Paragraph 79) shall pay a stipulated penalty of $750 per Day for each Day that the payment is late.

81.    <u>Late Payment of Civil Penalty to the State</u>.  If WJWW fails to pay the civil penalty required to be paid to the State under Paragraph 15 of Section VI (Civil Penalty) when due, WJWW and/or the Municipal Defendants (as applicable pursuant to Paragraph 79)  shall pay a stipulated penalty of $1,000 per Day for each Day that the payment is late.

82.    <u>Late Completion of Benefit Projects</u>.  Subject to Section XIII (Force Majeure), if WJWW fails to comply with the requirements of Paragraph 17 when required under any applicable schedules, WJWW and/or the Municipal Defendants (as applicable pursuant to Paragraph 79) shall pay a stipulated penalty according to the schedule set forth below:

| Penalty per violation per day | Period of non-compliance |
|---|---|
| $150 per Day | 1st through 14th Day |
| $300 per Day | 15th through 30th Day |
| $600 per Day | 31st Day and beyond |

83.    Compliance Milestones. Subject to Section XIII (Force Majeure), the following stipulated penalties shall accrue per violation per Day for each violation of the requirements identified in Section VII:

| Stipulated Penalties for Failure to Meet Interim Milestones (Paragraphs 23-30) per violation per day | Period of non-compliance |
|---|---|
| $500 per Day | 1st through 30th Day |
| $1,000 per Day | 31st through 90th Day |
| $2,000 per Day | 91st Day and beyond |
| Stipulated Penalties for Failure to Meet Final Milestones (Paragraphs 31-32) | Period of non-compliance |
| $1,000 per Day | 1st through 60th Day |
| $2,000 per Day | 61st Day to 120th Day |
| $3,000 per Day | 121st Day through 365th Day |
| $4,000 per Day | 366th Day and beyond |

84.    Interim Measures and Reporting and Meeting Requirements:  Subject to Section XIII (Force Majeure), the following stipulated penalties shall accrue per violation per Day for each violation of the reporting requirements of Sections VIII and XI:

| Penalty per violation per day | Period of non-compliance |
|---|---|
| $250 per Day | 1st through 14th Day |
| $500 per Day | 15th through 30th Day |
| $1,000 per Day | 31st Day and beyond |

85.   <u>Transfer of Ownership</u>:  If Defendants fail to: (a) provide a copy of this Consent Decree to any proposed transferee; (b) provide written notice to the United States, EPA, and the State at least 30 Days prior to any transfer of any portion of the Facility; or (c) provide a copy of the proposed written agreement with the transferee as required by Paragraph 6, Defendants shall pay a stipulated penalty of $10,000 per occurrence.

86.   <u>SEP Compliance</u>:

a.   Subject to Section XIII (Force Majeure), if Defendants fail to comply with the milestones in the SEP Memo attached as Appendix D for implementing the SEP, and/or if they fail to satisfactorily complete the SEP by the deadline set forth in Paragraph 61 SEP, WJWW and/or the Municipal Defendants (as applicable pursuant to Paragraph 79) shall pay stipulated penalties for each failure to meet an applicable deadline, as follows:

| Penalty per violation per day | Period of non-compliance |
| --- | --- |
| $250 per Day | 1st through 14th Day |
| $500 per Day | 15th through 30th Day |
| $1,000 per Day | 31st Day and beyond |

b.   Subject to Section XIII (Force Majeure), if Defendants fail to implement the SEP, or halt or abandon work on the SEP, WJWW and/or the Municipal Defendants (as applicable pursuant to Paragraph 79) shall pay a stipulated penalty of $1,200,000. The penalty under this subparagraph shall accrue as of the date specified for completing the SEP or the date performance ceases, whichever is earlier.

87.   Except as provided in Paragraph 86(b), stipulated penalties under this Section shall begin to accrue on the Day after performance is due or on the Day a violation occurs, whichever is applicable, and shall continue to accrue until performance is satisfactorily completed or until the violation ceases.  Stipulated penalties shall accrue simultaneously for separate violations of this Consent Decree.

88.   WJWW and/or the Municipal Defendants (as applicable pursuant to Paragraph 79) shall pay any stipulated penalty within 30 Days of receiving the United States' written demand, except for any stipulated penalty under Paragraphs 81 or 82.  With respect to any stipulated penalty under Paragraphs 81 or 82, WJWW and/or the Municipal Defendants (as applicable pursuant to Paragraph 79) shall pay any such stipulated penalty within 30 Days of receiving the State's written demand.  The United States will copy the State on any demand for payment of stipulated penalties, and the State shall copy the United States on any demand for payment of stipulated penalties.

89.   Either the United States or the State may, in the unreviewable exercise of its discretion, reduce or waive stipulated penalties otherwise due it under this Consent Decree.

90.     Stipulated penalties shall continue to accrue as provided in Paragraph 86 during any Dispute Resolution, but need not be paid until the following:

a.      If the dispute is resolved (i) by agreement of the Parties, (ii) by a decision or order of EPA that is not appealed to the Court, or (iii) in the event of a dispute solely with NYSDOH, by a decision or order of NYSDOH that is not appealed to the Court, Defendants shall pay accrued penalties determined to be owing, together with interest, to the United States and the State within 30 Days of the effective date of the agreement or the receipt of the United States' decision or order, or the NYSDOH decision or order, as the case may be.

b.      If the dispute is appealed to the Court and the United States or the State prevails in whole or in part, Defendants shall pay all accrued penalties determined by the Court to be owing, together with interest, within 60 Days of receiving the Court's decision or order, except as provided in subparagraph c, below.

c.      If any Party appeals the District Court's decision, Defendants shall pay all accrued penalties determined to be owing, together with interest, within 15 Days of receiving the final appellate court decision.

91.     Except for stipulated penalties under Paragraphs 80, 81, 82, and 86, Defendants shall pay 50 percent of the stipulated penalties owed under this Section XII to the United States and 50 percent of the stipulated penalties owed under this Section XII to the State, unless the State states that it will decline certain stipulated penalties, in which case Defendants shall pay 100 percent of those stipulated penalties to the United States.  Defendants shall pay 100 percent of the stipulated penalties under Paragraphs 80 and 86, if any, to the United States.  Defendants shall pay 100 percent of the stipulated penalties under Paragraphs 81 or 82, if any, to the State.

92.     Defendants shall pay stipulated penalties owing to the United States in the manner set forth in Paragraph 13 and with the confirmation notices required by Paragraph 14, except that the transmittal letter shall state that the payment is for stipulated penalties and shall state for which violation(s) the penalties are being paid.  Defendants shall pay stipulated penalties owing to the State in the manner set forth in Paragraph 16, except that the transmittal letter shall state, in addition to the information required under Paragraph 16, that the payment is for stipulated penalties and shall state for which violation(s) the penalties are being paid.

93.     If Defendants fail to pay stipulated penalties according to the terms of this Consent Decree, Defendants shall be liable for interest on such penalties, as provided for in 28 U.S.C. § 1961, accruing as of the date payment became due.  Nothing in this Paragraph shall be construed to limit the United States or the State from seeking any remedy otherwise provided by law for Defendants' failure to pay any stipulated penalties.

94.     The payment of penalties and interest, if any, shall not alter in any way Defendants' obligation to complete the performance of the requirements of this Consent Decree.

95.     Non-Exclusivity of Remedy.  Stipulated penalties are not the United States' or the State's exclusive remedy for violations of this Consent Decree.  Subject to the provisions of Section XVI (Effect of Settlement/Reservation of Rights), the United States and the State

expressly reserve the right to seek any other relief one or both of them deems appropriate for Defendants' violation of this Decree or applicable law, including but not limited to an action against Defendants for statutory penalties, additional injunctive relief, mitigation or offset measures, and/or contempt. However, the amount of any statutory or regulatory penalty assessed for a violation of this Consent Decree shall be reduced by an amount equal to the amount of any stipulated penalty assessed and paid pursuant to this Consent Decree.

96.    The United States and the State may seek, and the Court has jurisdiction to grant, equitable relief, in addition to stipulated penalties, to enforce the requirements of this Consent Decree.

## XIII.  FORCE MAJEURE

97.    "Force majeure," for purposes of this Consent Decree, is defined as any event arising from causes beyond the control of Defendants, of any entity controlled by Defendants, or of Defendants' contractors, that delays or prevents the performance of any obligation under this Consent Decree despite a Defendant's best efforts to fulfill the obligation. The requirement that Defendants exercise "best efforts to fulfill the obligation" includes using best efforts to anticipate any potential force majeure event and best efforts to address the effects of any potential force majeure event (a) as it is occurring and (b) following the potential force majeure, such that the delay and any adverse effects of the delay are minimized. "Force Majeure" does not include a Defendant's financial inability to perform an obligation under this Consent Decree.

98.    If any event occurs or has occurred that may delay the performance of any obligation under this Consent Decree, whether or not caused by a force majeure event, Defendants shall provide notice by electronic mail to the United States, EPA, and the State, in accordance with Section XVIII (Notices), within 5 business Days of when Defendants first knew that the event might cause a delay. Within seven Days after the notice is sent, Defendants shall provide in writing to the United States, EPA, and the State, in accordance with Section XVIII (Notices), an explanation and description of the reasons for the delay; the anticipated duration of the delay; all actions taken or to be taken to prevent or minimize the delay; a schedule for implementation of any measures to be taken to prevent or mitigate the delay or the effect of the delay; Defendants' rationale for attributing such delay to a force majeure event if they intend to assert such a claim; and a statement as to whether, in the opinion of Defendants, such event may cause or contribute to an endangerment to public health, welfare or the environment. Defendants shall include with any notice all available documentation supporting the claim that the delay was attributable to a force majeure event. Failure to comply with the above requirements shall preclude Defendants from asserting any claim of force majeure for that event for the period of time of such failure to comply, and for any additional delay caused by such failure. Defendants shall be deemed to know of any circumstance of which Defendants, any entity controlled by Defendants, or Defendants' contractors knew or should have known.

99.    If EPA, after reasonable opportunity for review and comment by the State, agrees that the delay or anticipated delay is attributable to a force majeure event, the time for performance of the obligations under this Consent Decree that are affected by the force majeure event will be extended by EPA, after a reasonable opportunity for review and comment by the State, for such time as is necessary to complete those obligations. An extension of the time for performance of the obligations affected by the force majeure event shall not, of itself, extend the

time for performance of any other obligation. EPA will notify Defendants in writing of the length of the extension, if any, for performance of the obligations affected by the force majeure event and will provide a copy of the notification to the State.

100.    If EPA, after a reasonable opportunity for review and comment by the State, does not agree that the delay or anticipated delay has been or will be caused by a force majeure event, EPA will notify Defendants in writing of its decision and will provide a copy of the notification to the State.

101.    If Defendants elect to invoke the dispute resolution procedures set forth in Section XIV (Dispute Resolution), they shall do so no later than 21 Days after receipt of EPA's notice. In any such proceeding, Defendants shall have the burden of demonstrating by a preponderance of the evidence that the delay or anticipated delay has been or will be caused by a force majeure event, that the duration of the delay or the extension sought was or will be warranted under the circumstances, that best efforts were exercised to avoid and mitigate the effects of the delay, and that Defendants complied with the requirements of Paragraphs 98 and 99. If Defendants carry this burden, the delay at issue shall be deemed not to be a violation by Defendants of the affected obligation of this Consent Decree identified to the United States, EPA, the State, and the Court.

102.    If any legal action is brought after the Effective Date which might delay performance of any of the milestones in this Consent Decree, Defendants shall provide notice of the legal action by electronic mail to the United States, EPA, and the State, in accordance with Section XVIII (Notices), within 5 business Days of when Defendants first become aware of the action. The Parties shall meet and confer within a reasonable time thereafter to determine the extent to which the action might delay performance of any of the milestones in this Consent Decree, and whether removal of the action to this Court is appropriate and authorized by law. All Parties reserve all rights to seek to remove or otherwise respond to such action as they may deem appropriate, regardless of the views of the other Parties to this Consent Decree.

## XIV.    DISPUTE RESOLUTION

103.    Unless otherwise expressly provided for in this Consent Decree, the dispute resolution procedures of this Section shall be the exclusive mechanism to resolve disputes arising under or with respect to this Consent Decree. Defendants' failure to seek resolution of a dispute under this Section shall preclude Defendants from raising any such issue as a defense to an action by the United States or the State to enforce any obligation of Defendants arising under this Decree.

104.    <u>Informal Dispute Resolution</u>. Any dispute subject to Dispute Resolution under this Consent Decree shall first be the subject of informal negotiations. The dispute shall be considered to have arisen when Defendants send the United States, EPA, and the State a written Notice of Dispute. Such Notice of Dispute shall state clearly the matter in dispute. The period of informal negotiations shall not exceed 45 Days from the date the dispute arises, unless that period is modified by written agreement among all Parties. If the Parties cannot resolve a dispute by informal negotiations, then the position advanced by the United States, after consultation with the State, shall be considered binding unless, within 14 Days after the

conclusion of the informal negotiation period, Defendants invoke formal dispute resolution procedures as set forth below.

105.  <u>Formal Dispute Resolution</u>.  Defendants shall invoke formal dispute resolution procedures, within the time period provided in the preceding Paragraph, by sending the United States, EPA, and the State a written Statement of Position regarding the matter in dispute.  The Statement of Position shall include, but need not be limited to, any factual data, analysis, or opinion supporting Defendants' position and any supporting documentation relied upon by Defendants.

106.  The United States and the State shall send Defendants their Statement of Position within 45 Days of receipt of Defendants' Statement of Position.  The United States' and State's Statement of Position shall include, but need not be limited to, any factual data, analysis, or opinion supporting that position and any supporting documentation relied upon by the United States and the State.  The United States' and State's Statement of Position is binding on Defendants, unless Defendants file a motion for judicial review of the dispute in accordance with the following Paragraph.

107.  <u>Judicial Dispute Resolution</u>.  Defendants may seek judicial review of the dispute by filing with the Court and serving on the United States and the State, in accordance with Section XVIII (Notices) of this Consent Decree, a motion requesting judicial resolution of the dispute.  The motion (a) must be filed within 21 Days of receipt of the United States' and State's Statement of Position pursuant to the preceding Paragraph, unless the Court requires the filing of a pre-motion letter before the filing of a motion, in which case the pre-motion letter must be filed within such 21-Day period; (b) may not raise any issue not raised in informal dispute resolution pursuant to Paragraph 104, unless the United States and the State raise a new issue of law or fact in their Statement of Position; (c) shall contain a written statement of Defendants' position on the matter in dispute, including any supporting factual data, analysis, opinion, or documentation, and (d) shall set forth the relief requested and any schedule within which the dispute must be resolved for orderly implementation of the Consent Decree.

108.  The United States and the State shall respond to Defendants' motion within the time period allowed by the Local Rules of this Court or any order of the Court.  Defendants may file a reply memorandum, as permitted by the Local Rules or any order of the Court.

109.  Standard of Review

a.  <u>Disputes Concerning Matters Accorded Record Review</u>.  Except as otherwise provided in this Consent Decree, in any dispute brought under Paragraph 104 pertaining to the adequacy or appropriateness of plans, procedures to implement plans, schedules or any other items requiring approval by EPA or the State under this Consent Decree; the adequacy of the performance of work undertaken pursuant to this Consent Decree; and all other disputes that are accorded review on the administrative record under applicable principles of administrative law, Defendants shall have the burden of demonstrating, based on the administrative record, that the position of the United States and/or the State is arbitrary and capricious or otherwise not in accordance with law.

27

b.    Other Disputes.  Except as otherwise provided in this Consent Decree, in any other dispute brought under Paragraph 104, Defendants shall bear the burden of demonstrating that their position complies with this Consent Decree and better furthers the objectives of the Consent Decree.

110.    The invocation of dispute resolution procedures under this Section shall not, by itself, extend, postpone, or affect in any way any obligation of Defendants under this Consent Decree, unless and until final resolution of the dispute so provides.  Stipulated penalties with respect to the disputed matter shall continue to accrue from the first Day of noncompliance, but payment shall be stayed pending resolution of the dispute as provided in Paragraph 90.  If Defendants do not prevail on the disputed issue, stipulated penalties shall be assessed and paid as provided in Section XII (Stipulated Penalties).

## XV.    INFORMATION COLLECTION AND RETENTION

111.    The United States, the State, and their representatives, including attorneys, contractors, and consultants, shall have the right of entry into any facility covered by this Consent Decree, at all reasonable times, upon presentation of credentials, to:

a.    monitor the progress of activities required under this Consent Decree;

b.    verify any data or information submitted to the United States or the State in accordance with the terms of this Consent Decree;

c.    obtain samples and, upon request, splits of any samples taken by Defendants or their representatives, contractors, or consultants;

d.    obtain documentary evidence, including photographs and similar data; and

e.    assess Defendants' compliance with this Consent Decree.

112.    Upon request, Defendants shall provide EPA and the State or their authorized representatives splits of any samples taken by Defendants.  Upon request, EPA and the State shall provide Defendants splits of any samples taken by EPA or the State.

113.    Until five years after the termination of this Consent Decree, Defendants shall retain, and shall instruct their contractors and agents to preserve, all non-identical copies of all documents, records, or other information (including documents, records, or other information in electronic form) in their or their contractors' or agents' possession or control, or that come into their or their contractors' or agents' possession or control, and that relate in any manner to Defendants' performance of their obligations under this Consent Decree.  This information-retention requirement shall apply regardless of any contrary corporate or institutional policies or procedures.  At any time during this information-retention period, upon request by the United States or the State, Defendants shall provide copies of any documents, records, or other information required to be maintained under this Paragraph, subject to any applicable privilege or immunity recognized by federal law.

114.    At the conclusion of the information-retention period provided in the preceding Paragraph, Defendants shall notify the United States and the State at least 90 Days prior to the destruction of any documents, records, or other information subject to the requirements of the preceding Paragraph and, upon request by the United States or the State, Defendants shall deliver any such documents, records, or other information to EPA or the State. Defendants may assert that certain documents, records, or other information are privileged under the attorney-client privilege or any other privilege or immunity recognized by federal law. If Defendants assert such a privilege, they shall provide the following: (a) the title of the document, record, or information; (b) the date of the document, record, or information; (c) the name and title of each author of the document, record, or information; (d) the name and title of each addressee and recipient; (e) a description of the subject of the document, record, or information; and (f) the privilege asserted by Defendants. However, no documents, records, or other information created or generated pursuant to the requirements of this Consent Decree shall be withheld on grounds of privilege or immunity.

115.    Defendants may also assert that information required to be provided under this Section is protected as Confidential Business Information ("CBI") under 40 C.F.R. Part 2. As to any information that Defendants seek to protect as CBI, Defendants shall follow the procedures set forth in 40 C.F.R. Part 2.

116.    This Consent Decree in no way limits or affects any right of entry and inspection, or any right to obtain information, held by the United States or the State pursuant to applicable federal or state laws, regulations, or permits, nor does it limit or affect any duty or obligation of Defendants to maintain documents, records, or other information imposed by applicable federal or state laws, regulations, or permits.

## XVI.   EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS

117.    This Consent Decree resolves only the civil claims of the United States for the violations alleged in the Complaint in this action through the Date of Lodging.

118.    This Consent Decree resolves only the civil claims of the State for the violations alleged in the Complaint-In-Intervention in this action through the Date of Lodging, as well as Defendants' liability under the State Court Judgment. For the avoidance of doubt, this Consent Decree does not resolve any civil claims of the State that (a) are not alleged, respectively, in the Complaint and the Complaint-in-Intervention, or (b) do not arise out of the State Court Judgment.

119.    The United States and the State reserve all legal and equitable remedies available to enforce the provisions of this Consent Decree, except as expressly stated in Paragraphs 117 and 118. This Consent Decree shall not be construed to limit the rights of the United States or the State to obtain penalties or injunctive relief under the Act or implementing regulations, including but not limited to the Stage 2 DBPR, or under other federal, state, or local laws, regulations, or permit conditions, including but not limited to the filtration requirements of the State Sanitary Code, except as expressly specified in the preceding Paragraph. The United States and the State further reserve all legal and equitable remedies to address any imminent and substantial endangerment to the public health or welfare or the environment arising at, within, or

posed by, the WJWW Water System, whether related to the violations addressed in this Consent Decree or otherwise.

120. In any subsequent administrative or judicial proceeding initiated by the United States or the State for injunctive relief, civil penalties, other appropriate relief relating to the WJWW Water System, or Defendants' violations, Defendants shall not assert, and may not maintain, any defense or claim based upon the principles of waiver, res judicata, collateral estoppel, issue preclusion, claim preclusion, claim-splitting, or other defenses based upon any contention that the claims raised by the United States or the State in the subsequent proceeding were or should have been brought in the instant case, except with respect to claims that have been specifically resolved pursuant to Paragraphs 117 and 118.

121. This Consent Decree is not a permit, or a modification of any permit, under any federal, State, or local laws or regulations. This Consent Decree is not, and shall not be interpreted as, a waiver or variance from, or modification of, the SDWA, the Stage 2 DBPR, the Public Health Law or the State Sanitary Code. For avoidance of doubt, nothing herein shall relieve Defendants of their independent obligation to ensure that all drinking water delivered to the WJWW Water System is in compliance with all National Primary Drinking Water Regulations and other applicable federal, State and local laws, regulations and permits. Defendants are responsible for achieving and maintaining complete compliance with all applicable federal, State, and local laws, regulations, and permits; and Defendants' compliance with this Consent Decree shall be no defense to any action commenced pursuant to any such laws, regulations, or permits, except as set forth herein. The United States and the State do not, by their consent to the entry of this Consent Decree, warrant or aver in any manner that Defendants' compliance with any aspect of this Consent Decree will result in compliance with provisions of the SDWA, 42 U.S.C. § 300f *et seq.*, with the Stage 2 DBPR, or with any other provisions of federal, State, or local laws, regulations, or permits, if applicable.

122. This Consent Decree does not limit or affect the rights of Defendants or of the United States or the State against any third parties not party to this Consent Decree, nor does it limit the rights of third parties not party to this Consent Decree, against Defendants, except as otherwise provided by law.

123. This Consent Decree shall not be construed to create rights in, or grant any cause of action to, any third party not party to this Consent Decree.

## XVII. COSTS

124. The Parties shall bear their own costs of this action and any dispute resolution proceeding instituted under Section XIV, including attorneys' fees, except that the United States and the State shall be entitled to collect the costs (including attorneys' fees) incurred in any action necessary to collect any portion of the civil penalty or any stipulated penalties due but not paid by Defendants.

# XVIII. NOTICES

125.     Unless otherwise specified in this Decree, whenever notifications, submissions, or communications are required by this Consent Decree, they shall be made in writing and sent by mail or email, with a preference for email, addressed as follows:

To the United States:

Tomoko Onozawa
Samuel Dolinger
Assistant United States Attorneys
U.S. Attorney's Office, Southern District of New York
86 Chambers Street, 3rd Floor
New York, New York 10007
Email:  tomoko.onozawa@usdoj.gov
            samuel.dolinger@usdoj.gov

eescdcopy.enrd@usdoj.gov
Re: DJ # 90-5-1-1-12441

EES Case Management Unit
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, D.C.  20044-7611
Re: DJ # 90-5-1-1-12441

To the EPA:

Chief, Water Compliance Branch
Division of Enforcement and Compliance Assistance
U.S. Environmental Protection Agency, Region II
290 Broadway, 20th Floor
New York, NY 10007
Email: mckenna.douglas@epa.gov

Chief, Water and General Law Branch
Office of Regional Counsel
U.S. Environmental Protection Agency, Region II
290 Broadway, 16th Floor
New York, NY 10007

To the State/NYSDOH:

Andrew G. Frank
Assistant Attorney General
New York State Attorney General's Office
28 Liberty Street, 19th Floor
New York, NY  10005
Email:  andrew.frank@ag.ny.gov

Jessica Hall
New York State Department of Health

Bureau of Litigation
Corning Tower, Room 2425
Empire State Plaza
Albany, NY  12237
Email:  jessica.hall@health.ny.gov

New York State Department of Health
Bureau of Water Supply Protection
Attn:  Kristine Wheeler, Director
Corning Tower, Room 1110
Empire State Plaza
Albany, NY  12237
Email: kristine.wheeler@health.ny.gov

To WJWW:                          Paul Kutzy, P.E.
Manager
Westchester Joint Water Works
1625 Mamaroneck Avenue
Mamaroneck, NY 10543
Email: pkutzy@wjww.com

Mary Polvere
Secretary to Board of Trustees
Westchester Joint Water Works
1625 Mamaroneck Avenue
Mamaroneck, New York 10543
Email: mpolvere@wjww.com

Lori Lee Dickson, Esq.
General Counsel to Westchester Joint Water Works
McCarthy Fingar LLP
711 Westchester Avenue, Suite 405
White Plains, NY 10604
Email: ldickson@mccarthyfingar.com

Philip E. Karmel Esq.
Special Counsel to Westchester Joint Water Works
Bryan Cave Leighton Paisner LLP
1290 Avenue of the Americas
New York, New York 10104
Email: philip.karmel@bclplaw.com

To the Town/Village of Harrison:    The Hon. Rich Dionisio
                                    Supervisor/Mayor
                                    Town/Village of Harrison
                                    1 Heineman Place
                                    Harrison, NY 10528
                                    Email: rdionisio@harrison-ny.gov

                                    Scott A. Resnik, Esq.
                                    Special Counsel to Town/Village of Harrison
                                    Katten Muchin Rosenman LLP
                                    50 Rockefeller Plaza
                                    New York, NY 10020-1605
                                    Email: scott.resnik@katten.com

To the Town of Mamaroneck:          The Hon. Jaine Elkind Eney
                                    Supervisor
                                    Town of Mamaroneck
                                    740 West Boston Post Road
                                    Mamaroneck, NY 10543
                                    Email: supervisor@TownofmamaroneckNY.org

                                    Robert Spolzino, Esq.
                                    Special Counsel to Town of Mamaroneck
                                    Abrams Fensterman, LLP
                                    81 Main Street Suite 400
                                    White Plains, New York 10601
                                    Email: RSpolzino@Abramslaw.com

To the Village of Mamaroneck:       The Hon. Sharon Torres
                                    Mayor
                                    Village of Mamaroneck
                                    123 Mamaroneck Avenue
                                    Mamaroneck, NY 10543
                                    Email: storres@vomny.org

                                    Robert Spolzino, Esq.
                                    Special Counsel to Village of Mamaroneck
                                    Abrams Fensterman, LLP
                                    81 Main Street Suite 400
                                    White Plains, New York 10601
                                    Email: RSpolzino@Abramslaw.com

126.    Any Party may, by written notice to the other Parties, change its designated notice recipient or notice address provided above.

127.    Notices submitted pursuant to this Section shall be deemed submitted upon mailing or transmission by email, unless otherwise provided in this Consent Decree or by mutual agreement of the Parties in writing.

## XIX.    EFFECTIVE DATE

128.    The Effective Date of this Consent Decree shall be the date upon which this Consent Decree is entered by the Court or a motion to enter the Consent Decree is granted, whichever occurs first, as recorded on the Court's docket.

## XX.    RETENTION OF JURISDICTION

129.    The Court shall retain jurisdiction over this case until termination of this Consent Decree for the purpose of resolving disputes arising under this Decree (including any dispute among Defendants as to their financial responsibility, vis-à-vis one another, for stipulated penalties owed to the United States or the State), entering orders modifying this Decree, or effectuating or enforcing compliance with the terms of this Decree.

## XXI.    MODIFICATION

130.    The terms of this Consent Decree, including any attached appendices, may be modified only by a subsequent written agreement signed by all the Parties or pursuant to Paragraph 131 below.  Where the modification constitutes a material change to this Decree, it shall be effective only upon approval by the Court.

131.    Any disputes concerning modification of this Decree shall be resolved pursuant to Section XIV (Dispute Resolution), provided, however, that, instead of the burden of proof provided by Paragraph 109, the Party seeking the modification bears the burden of demonstrating that it is entitled to the requested modification in accordance with Federal Rule of Civil Procedure 60(b).

## XXII.    TERMINATION

132.    If Defendants have (i) maintained continuous satisfactory compliance with this Consent Decree for the preceding twelve months, including those relating to the Benefit Projects required by Paragraph 17, and the SEP required by Section X; (ii) operated a Filtration Plant in compliance with and without any violations of the SDWA, the Stage 2 DBPR, the Public Health Law and regulations promulgated thereunder, including the State Sanitary Code, continuously for the preceding twelve months; and (iii) paid the civil penalty and any accrued stipulated penalties as required by this Consent Decree, Defendants may serve upon the United States and the State a Request for Termination, stating that Defendants have satisfied these requirements, together with all necessary supporting documentation.

133.    Following receipt by the United States and the State of Defendants' Request for Termination, the Parties shall confer informally concerning the Request and any disagreement that the Parties may have as to whether Defendants have satisfactorily complied with the requirements for termination of this Consent Decree.  If the United States and the State agree that

the Decree may be terminated, the Parties shall submit, for the Court's approval, a joint stipulation terminating the Decree.

134.    If the United States and/or the State do not agree that the Decree may be terminated, Defendants may invoke Dispute Resolution under Section XIV.  However, Defendants shall not seek Dispute Resolution of any dispute regarding termination until 60 Days after service of their Request for Termination.

## XXIII. PUBLIC PARTICIPATION

135.    This Consent Decree shall be lodged with the Court for a period of not less than 30 Days for public notice and comment in accordance with 28 C.F.R. § 50.7.  The United States reserves the right to withdraw or withhold its consent if the comments received disclose facts or considerations which indicate that this Consent Decree is inappropriate, improper or inadequate, and the State reserves the right to withdraw or withhold consent if the United States withdraws or withholds consent and/or comments received disclose facts or considerations which indicate that this Consent Decree is inconsistent with state law.  Defendants consent to entry of this Consent Decree without further notice and agree not to withdraw from or oppose entry of this Consent Decree by the Court or to challenge any provision of the Decree, unless the United States and/or the State have notified Defendants in writing that it no longer supports (or they no longer support) entry of the Decree.

## XXIV. SIGNATORIES/SERVICE

136.    Each undersigned representative of Defendants, the State, and the Department of Justice certifies that he or she is fully authorized to enter into the terms and conditions of this Consent Decree and to execute and legally bind the Party he or she represents to this document.

137.    This Consent Decree may be signed in counterparts, and its validity shall not be challenged on that basis.  Defendants agree to accept service of process by mail with respect to all matters arising under or relating to this Consent Decree and to waive the formal service requirements set forth in Rules 4 and 5 of the Federal Rules of Civil Procedure and any applicable Local Rules of this Court including, but not limited to, service of a summons. Defendants need not file answers to the Complaint and Complaint-in-Intervention in this action unless or until the Court expressly declines to enter this Consent Decree.

## XXV.  INTEGRATION

138.    This Consent Decree, including deliverables that are subsequently approved pursuant to this Decree, constitutes the entire agreement among the Parties regarding the subject matter of the Decree and supersedes all prior representations, agreements and understandings, whether oral or written, concerning the subject matter of the Decree herein.  Other than such deliverables or appendices or schedules made part of this Consent Decree, no other document, nor any representation, inducement, agreement, understanding or promise constitutes any part of this Consent Decree or the settlement it represents, nor shall it be used in construing the terms of this Consent Decree.  Upon the Effective Date, this Consent Decree supersedes the November 26, 2019, EPA administrative order addressed to WJWW.

## XXVI. 26 U.S.C. § 162(f)(2)(A)(ii) IDENTIFICATION

139.    For purposes of the identification requirement in Section 162(f)(2)(A)(ii) of the Internal Revenue Code, 26 U.S.C. § 162(f)(2)(A)(ii), and 26 C.F.R. § 1.162-21(b)(2), performance of the obligations of Sections VII through IX is restitution, remediation, or required to come into compliance with law.

## XXVII.        HEADINGS

140.    Headings to the Sections and Subsections of this Consent Decree are provided for convenience and do not affect the meaning or interpretation of the provisions of this Consent Decree.

## XXVIII.        FINAL JUDGMENT

141.    Upon approval and entry of this Consent Decree by the Court, this Consent Decree shall constitute a final judgment of the Court as to the United States, the State, and Defendants.

## XXIX. APPENDICES

142.    The following Appendices are attached to and part of this Consent Decree:

Appendix A: Quarry Heights Benefit Project Information
Appendix B: Flushing Protocol
Appendix C: Source Water Monitoring Plan
Appendix D: SEP Memo

**The Clerk of Court is kindly directed to terminate the motion at ECF No. 20 and terminate this action.__**

_____

**UNITED STATES DISTRICT JUDGE NELSON S. ROMÁN**

**Dated: September 23, 2024**
**White Plains, NY**

FOR THE UNITED STATES OF AMERICA:


Dated:     June 24, 2024

                              DAMIAN WILLIAMS
                              United States Attorney for the
                              Southern District of New York

              By:      _____
                              SAMUEL DOLINGER
                              TOMOKO ONOZAWA
                              Assistant United States Attorneys
                              86 Chambers Street, 3rd Floor
                              New York, New York 10007
                              Tel.: (212) 637-2677/2721
                              samuel.dolinger@usdoj.gov
                              tomoko.onozawa@usdoj.gov

FOR THE U.S. ENVIRONMENTAL PROTECTION AGENCY:

Dated: _05/28/2024_ 

ROSEMARIE KELLEY    Digitally signed by
ROSEMARIE KELLEY
Date: 2024.05.28
15:59:27 -04'00'

ROSEMARIE KELLEY
Office Director
Office of Civil Enforcement
Office of Enforcement and Compliance Assurance
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Washington, DC 20460


OF COUNSEL:
Chrisna Baptista
Attorney Advisor, Water Enforcement Division
Office of Civil Enforcement
Office of Enforcement and Compliance Assurance
U.S. Environmental Protection Agency
1200 Pennsylvania Ave., NW
Washington, DC 20460

FOR THE U.S. ENVIRONMENTAL PROTECTION AGENCY:

Dated: _____ **May 28, 2024**

PAUL SIMON
Digitally signed by PAUL SIMON
Date: 2024.05.28 12:07:30
-04'00'

_____
PAUL SIMON
Regional Counsel
U.S. Environmental Protection Agency, Region 2
290 Broadway
New York, New York 10007

OF COUNSEL:
Phyllis S. Kaplan Feinmark
Chief, Water and General Law Branch
Office of Regional Counsel
U.S. Environmental Protection Agency, Region 2
290 Broadway
New York, New York 10007

FOR THE STATE OF NEW YORK and JAMES V. McDONALD, as COMMISSIONER of the
NEW YORK STATE DEPARTMENT OF HEALTH:

Dated: _June 5, 2024_

<div style="margin-left: 40%;">

LETITIA JAMES
Attorney General of the State of New York

By: _____

ANDREW J. GERSHON
ANDREW G. FRANK
Assistant Attorneys General
N.Y.S. Attorney General's Office
28 Liberty Street, 19th Floor
New York, New York 10005
Tel.: (212) 416-8474/8271
andrew.gershon@ag.ny.gov
andrew.frank@ag.ny.gov

</div>

FOR DEFENDANT WESTCHESTER JOINT WATER WORKS:

Dated: May 23, 2024

Paul Kutzy, P.E.
Manager
Westchester Joint Water Works
1625 Mamaroneck Avenue
Mamaroneck, NY 10543

*Approved as to Form:*

Dated: May 30, 2024

McCarthy, Fingar LLP

By:

Lori Lee Dickson
711 Westchester Avenue, Suite 405
White Plains, NY 10604
Telephone: 914-385-1023
Email: ldickson@mccarthyfingar.com
*General Counsel to Westchester Joint Water Works*

Dated: May 23, 2024

Bryan Cave Leighton Paisner LLP

By:

Philip E. Karmel
1290 Avenue of the Americas
New York, New York 10104
Telephone: 212-541-2311
Email: pekarmel@bclplaw.com
*Attorneys for Defendant Westchester Joint Water Works*

FOR DEFENDANT TOWN/VILLAGE OF HARRISON:

Dated: 5-31-24

The Hon. Rich Dionisio
Supervisor/Mayor
Town/Village of Harrison
1 Heineman Place
Harrison, NY 10528
Email: rdionisio@harrison-ny.gov

*Approved as to Form:*

Dated: 5/31/24

Katten Muchin Rosenman LLP

By: _____

Scott A. Resnik
50 Rockefeller Plaza
New York, NY 10020-1605
Telephone: 212.940.8543
Email: scott.resnik@katten.com
*Attorneys for Defendant Town/Village of Harrison*

FOR DEFENDANT TOWN OF MAMARONECK:

Dated: June 3, 2024

The Hon. Jaine Elkind Eney - Supervisor
Supervisor
Town of Mamaroneck
740 West Boston Post Road
Mamaroneck, NY 10543
Email: supervisor@TownofmamaroneckNY.org

*Approved as to Form:*

Dated: June 3, 224

Abrams Fensterman, LLP

By: _____
Robert Spolzino
81 Main Street Suite 400
White Plains, New York 10601
Telephone: 914-607-7102
Email: RSpolzino@Abramslaw.com
*Attorneys for Defendant Town of Mamaroneck*

FOR DEFENDANT VILLAGE OF MAMARONECK:

Dated: ___6/3/24___

The Hon. Sharon Torres
Mayor
Village of Mamaroneck
123 Mamaroneck Avenue
Mamaroneck, NY 10543
Email: storres@vomny.org

*Approved as to Form:*

Dated: ___June 3, 2024___

Abrams Fensterman, LLP

By: _____
Robert Spolzino
81 Main Street Suite 400
White Plains, New York 10601
Telephone: 914-607-7102
Email: RSpolzino@Abramslaw.com
*Attorneys for Defendant Village of Mamaroneck*

**APPENDIX A**

**Quarry Heights Benefit Project Information**

This project scope to facilitate the provision of water service to residents on streets in the Quarry Heights area of North Castle incorporates 2 major components:

- Construction of 3 vaults to house the necessary meters and other equipment required to connect to the existing WJWW water main in this area to facilitate provision of water to North Castle residents in Quarry Heights in the future;
- Construction of a significant water main extension into the most developed area along Williams St and James St. to allow for the connection of several properties in that area and to also facilitate the provision of temporary water as well as fire protection;

The construction of the metering vaults is a necessary first step to provide water service into these streets. The vaults will provide housing and access to the meter and ancillary equipment, including a check valve which will prevent return flow through the meter in the event of a backflow condition in WJWW's water mains. The 3 vaults will be constructed at the following streets, and will include a short main extension of approximately 20 linear feet to facilitate the construction of the metering vault:

- Johnson Place
- Memorial Lane
- William Street

Johnson Place and Memorial Lane, which provide access to 4 and 5 homes respectively, will include a stub (< 20 linear feet) of water main downstream of the vault, with an inline control valve, and a tee serving a fire hydrant to provide a point of connection for flushing, emergency water service connection, and fire protection. This stub will be fitted with a mechanical joint cap which can be removed in the future, should the water main be extended down these streets. The William Street vault will incorporate an additional feature, a downstream inline control valve, leading into the water main extension.

The water main extension is designed to provide service to a number of households in this area which were previously affected by well issues and requested emergency water service from WJWW in late 2022, while also facilitating points of connection for future water main extensions to the remainder of the developed area. The extension is approximately 560 linear feet of 6" water main down Williams Street, with necessary valves & hydrants, and approximately 330 linear feet of additional 6" water main down James Street and around the corner to Starkey Road. As with Johnson Place and Memorial Lane, the dead ends of this water main extension will be fitted with a mechanical joint cap which can be removed in the future should the water main be extended further. This extension will allow for direct water service connections to a total of 14 homes, 7 of which were previously provided emergency water service from WJWW in late 2022.

Our preliminary cost estimate for metering vault facilities is $210,000 ($70,000 per vault). The estimated total cost of the water main extension down William St and James St is $890,000 which includes excavation, rock removal, installation of facilities (including material costs), and restoration. The total cost of the overall project is estimated at $1.1 million.



**APPENDIX B**

**Flushing Protocol**



# FLUSHING PROGRAM

**Westchester Joint Water Works**

January 2020



# TABLE OF CONTENTS

SECTION                                                                                    PAGE NO.

1.  FLUSHING PROGRAM.................................................................................1-1
    1.1    Semi-Annual Hydrant Flushing...........................................................1-1
    1.2    Periodic Manual Blowoff Flushing ......................................................1-1
    1.3    Daily Automatic Flushing ..................................................................1-1
    1.4    Flushing of Contingent Locations .......................................................1-1
2.  FLUSHING PROGRAM IMPLEMENTATION ...............................................2-1
    2.1    Flushing Procedures.........................................................................2-1
    2.1.1  Public Relations...............................................................................2-1
    2.1.2  Field Safety .....................................................................................2-2
    2.1.3  Implementation ................................................................................2-4
    2.1.4  Flushing Procedures.........................................................................2-4
    2.1.5  Data Collection ................................................................................2-4
    2.2    Results Evaluation............................................................................2-5

# LIST OF TABLES

TABLE                                                                                      PAGE NO.

Table 1-1: Flushing Locations .......................................................................... 1-2
Table 2-1: Location of Hospitals and Dialysis Centers....................................... 2-1
Table 2-2: Fire Department Contacts................................................................. 2-2
Table 2-3: Equipment List for Flushing ............................................................. 2-4

# APPENDICES

Appendix A:    Sample Public Notice
Appendix B:    Frequently Asked Questions
Appendix C:    Flushing Field Forms



# 1. FLUSHING PROGRAM

The goal of Westchester Joint Water Works' (WJWW) flushing program is to minimize water age, reduce the chance of disinfection byproduct formation, maintain hydrant function, and remove built-up sediment in WJWW's distribution system. WJWW's flushing program includes the following types of flushing:

1. Semi-annual hydrant flushing

2. Periodic manual blowoff flushing

3. Daily automatic flushing

4. Flushing of contingent locations

The locations of each of these types of flushing are shown on Figure 1, except for semi-annual hydrant flushing, which occurs at each hydrant location across the system.

## 1.1  SEMI-ANNUAL HYDRANT FLUSHING

Every 6 months, WJWW undertakes a comprehensive system-wide hydrant flushing program to confirm satisfactory operation of the hydrants and remove accumulated sediment from the water mains. WJWW flushes every hydrant in their system (approximately 2,200) until the water runs clear. Semi-annual hydrant flushing occurs over two weeks and flushing continues through all 3 work shifts until all hydrants have been flushed.

## 1.2  PERIODIC MANUAL BLOWOFF FLUSHING

WJWW has 59 manual blow-offs throughout its system, typically located at dead ends of water mains. WJWW manually flushes each of these blowoffs once every two to four weeks. The blowoffs are flushed until the water runs clear and an acceptable chlorine residual is measured in the blowoff water. Periodic manual blowoff flushing occurs between 7am and 9 pm every day except Sundays.

## 1.3  DAILY AUTOMATIC FLUSHING

In late 2019, WJWW completed installation of automatic flushers at 7 locations and began flushing. These automatid flushers are located on Old Orchard Road, Lincoln Lane, Lincoln Avenue, Post Office Road, South Ridge Road, Frederick Court, and Corporate Park Drive. Each of these automatic flushers flows at 200 gpm for a few hours each night, except for Frederick Court, which only flows once per week. Automatic flushing happens between 11pm and 4am.

## 1.4  FLUSHING OF CONTINGENT LOCATIONS

Through modeling, WJWW has identified areas of the system with high water age. If future sampling results show that the first four regular flushing methods are insufficient to control disinfection byproducts, WJWW flushes six additional contingent locations in areas where modeling shows high water age. Flushing is conducted until chlorine residuals in the flushed water reach the same level as lower water age areas of the distribution system..



## Table 1-1: Flushing Locations

| Flushing Location | Municipality | Flushing Type |
|---|---|---|
| Ellis Pl | Mamaroneck | Periodic Manual Blowoff Flushing |
| Bradley St. | Mamaroneck | Periodic Manual Blowoff Flushing |
| Louis St. | Mamaroneck | Periodic Manual Blowoff Flushing |
| Bradford Ave. | Mamaroneck | Periodic Manual Blowoff Flushing |
| Kassel Court | Mamaroneck | Periodic Manual Blowoff Flushing |
| Kassel Court | Mamaroneck | Periodic Manual Blowoff Flushing |
| Heathcote Ave | Mamaroneck | Periodic Manual Blowoff Flushing |
| English Place | Mamaroneck | Periodic Manual Blowoff Flushing |
| English Place | Mamaroneck | Periodic Manual Blowoff Flushing |
| Beechwood Drive | Mamaroneck | Periodic Manual Blowoff Flushing |
| Side Street on Oak Lane | Mamaroneck | Periodic Manual Blowoff Flushing |
| Langdon Lane | Mamaroneck | Periodic Manual Blowoff Flushing |
| Sylvan Lane | Mamaroneck | Periodic Manual Blowoff Flushing |
| Oak Lane Dead End | Mamaroneck | Periodic Manual Blowoff Flushing |
| 805 Mamaroneck Ave | Mamaroneck | Periodic Manual Blowoff Flushing |
| 806 Mamaroneck Ave | Mamaroneck | Periodic Manual Blowoff Flushing |
| 29 Clifford Place | Harrison | Periodic Manual Blowoff Flushing |
| Shelton St | Harrison | Periodic Manual Blowoff Flushing |
| Franklin Ave | Harrison | Periodic Manual Blowoff Flushing |
| Walnut Lane (Dead End) | Harrison | Periodic Manual Blowoff Flushing |
| South Rd. | Harrison | Periodic Manual Blowoff Flushing |
| Bruce Ave | Harrison | Periodic Manual Blowoff Flushing |
| Ann St | Harrison | Periodic Manual Blowoff Flushing |
| West Street Subdivision | Harrison | Periodic Manual Blowoff Flushing |
| Bradford Place | Harrison | Periodic Manual Blowoff Flushing |
| Fredrick Ct | Harrison | Periodic Manual Blowoff Flushing |
| Mayfair Circle Dead | Harrison | Periodic Manual Blowoff Flushing |
| Canterbury Rd S Dead | Harrison | Periodic Manual Blowoff Flushing |
| Westview Dr. The Spring | Harrison | Periodic Manual Blowoff Flushing |
| 6 Pondview W | Harrison | Periodic Manual Blowoff Flushing |
| Hancock St. | Harrison | Periodic Manual Blowoff Flushing |
| Rockland Rd | Harrison | Periodic Manual Blowoff Flushing |



| Flushing Location | Municipality | Flushing Type |
|---|---|---|
| Woodland Rd | Harrison | Periodic Manual Blowoff Flushing |
| Oak Valley Lane | Purchase | Periodic Manual Blowoff Flushing |
| Ophir Drive | Purchase | Periodic Manual Blowoff Flushing |
| Beverly Rd | Purchase | Periodic Manual Blowoff Flushing |
| Lincoln Lane | Purchase | Periodic Manual Blowoff Flushing |
| 10 Bruce Rd. | Mamaroneck | Periodic Manual Blowoff Flushing |
| Country Rd. | Mamaroneck | Periodic Manual Blowoff Flushing |
| Elkan Rd | Mamaroneck | Periodic Manual Blowoff Flushing |
| Overlook Terrace | Mamaroneck | Periodic Manual Blowoff Flushing |
| Colonial Ave. | Mamaroneck | Periodic Manual Blowoff Flushing |
| 23 Dillon Rd | Mamaroneck | Periodic Manual Blowoff Flushing |
| 7 Hilltop Rd | Mamaroneck | Periodic Manual Blowoff Flushing |
| 5 Poccia Circle | Mamaroneck | Periodic Manual Blowoff Flushing |
| Heather Lane | Mamaroneck | Periodic Manual Blowoff Flushing |
| Durham Rd | Mamaroneck | Periodic Manual Blowoff Flushing |
| Old Orchard Road | Harrison | Daily Automatic Flushing |
| Lincoln Lane | Purchase | Daily Automatic Flushing |
| Lincoln Ave | Purchase | Daily Automatic Flushing |
| Corporate Park Drive | Harrison | Daily Automatic Flushing |
| Post Office Road | Mamaroneck | Daily Automatic Flushing |
| South Ridge Road | Mamaroneck | Daily Automatic Flushing |
| Frederick Court | Mamaroneck | Daily Automatic Flushing |
| Woodside Ave E | Harrison | Contingent Flushing |
| Horton Lane | Harrison | Contingent Flushing |
| Lakeside Dr | Harrison | Contingent Flushing |
| Off Map | Mamaroneck | Contingent Flushing |
| West Flagler Drive | Mamaroneck | Contingent Flushing |
| Pleasant Ridge Rd | Harrison | Contingent Flushing |



**WESTCHESTER JOINT WATER WORKS**

*FIGURE 1*
*FLUSHING LOCATIONS*

SCALE: 1 " = 4,000 '          DATE: JANUARY 2020

**Legend**

Tanks

Monthly Blowoff Flushing Locations

Daily Automatic Flushing Locations

Contingent Flushing Locations

NYC Aqueduct

WJWW Member Municipal Boundary

**Water Mains**
12" and Less
Greater than 12"

0   2,000  4,000      8,000      12,000      16,000
Feet

Sources: Esri, HERE, DeLorme, ...
(Hong Kong), Esri Korea, Esri (Tha...
User Community



# 2. FLUSHING PROGRAM IMPLEMENTATION

The success of any flushing program depends on careful planning and standardized implementation procedures. Careful analysis and operational procedures are essential to flushing operations and protection of public assets. This section describes operational details to ensure a smooth flushing process.

## 2.1 FLUSHING PROCEDURES

### 2.1.1 Public Relations

Citizen sensitivity to apparent waste by a public agency, the sight of a water utility crew letting hydrants run into the street, and the potential for discolored water during the flushing event can trigger numerous complaint calls. Therefore, public notification is essential to implementing and maintaining an effective flushing program. It is important for the public to understand the reasons that flushing is conducted, such as improving water quality, improving system hydraulics, and ensuring that water can and will be made available in emergency situations.

An effective public relations program consists of notification and education. Adequate notice should be given whenever possible using a variety of mediums to reach as many parties as possible. A notice is published on WJWW's web-site (see Appendix A) prior to flushing activities.

Prior to beginning a flushing program, sensitive users such as hospitals, sites with onsite water treatment technologies, and kidney dialysis centers should be notified and care should be taken to minimize the impact to such users. A list of existing known sensitive users is in Table 2-1:

**Table 2-1: Location of Hospitals and Dialysis Centers**

| Facility Name | Municipality | Facility Type |
|---|---|---|
| St. Vincent's Hospital Westchester | Harrison | Hospital |
| Special Needs Services of Westchester | Mamaroneck | Hospital |
| Mount Sinai Medical Center | Mamaroneck | Hospital |
| Scarsdale Medical Group LLP | Harrison | Hospital |
| CityMD Mamaroneck Urgent Care | Mamaroneck | Urgent Care |
| Habor Immediate Medical Care | Mamaroneck | Urgent Care |
| MD Urgent Care Center | Mamaroneck | Urgent Care |
| PM Pediatrics | Mamaroneck | Medical Office |
| Minute Clinic | Larchmont | Medical Office |
| Westchester Family Practice | Larchmont | Medical Office |
| DaVita Kidney Care | Purchase | Dialysis Center |

To accomplish the education component of the public relations program, WJWW has adopted a set of Frequently Asked Questions (FAQs), attached as Appendix B. The questions and answers are be posted on WJWW's website



and made available for handout at WJWW's office. Operators should also carry flyers or printouts with the FAQs while conducting the flushing program to be distributed to system customers upon request.

Additional stakeholders that must be notified include the member municipalities' local fire departments. Flushing schedules should be reviewed with the identified stakeholders to avoid potential problems. A table of these stakeholders is presented in Table 2-2.

**Table 2-2: Fire Department Contacts**

| Fire Department | Municipality | Phone Number |
|---|---|---|
| Harrison Fire Department | Harrison | (914) 835-1106 |
| West Harrison Fire Department | Harrison | (914) 684-8823 |
| Purchase Fire Department | Harrison | (914) 253-9044 |
| Town of Mamaroneck Fire Department | Larchmont | (914) 834-2438 |
| Village of Mamaroneck Fire Department | Mamaroneck | (914) 381-3178 |
| Village of Larchmont Fire Department | Larchmont | (914) 834-0016 |

It is also imperative that positive relations with customers are maintained during the flushing program. Flushing crews should be mindful of public perception and support a polite and cooperative environment. Care must be taken not to flood basements, streets, and private property. Care also must be taken to eliminate problems for pedestrians and traffic.

## 2.1.2   Field Safety

In addition to WJWW's established safety program, staff should be aware of safe procedures, accident prevention, emergency response, and first aid techniques. Poor safety practices can result in damage to property and injury to both crew members and the general public, which is especially true with flushing velocities greater than 5 feet per second.

Provision must be made for the safety of the public. Traffic control, disposal of water, and control of people must be well planned and implemented. A list of safety tips is presented on the next page. This list should be reviewed by flushing crew members prior to the start of any flushing procedure.





**FLUSHING SAFETY**



- Utilize proper personal protective equipment and the correct tools for flushing operations. Ensure that these tools are well-maintained and replaced when necessary

- When possible and desirable, two individuals should conduct each hydrant flushing activity.

- Reflective, bright-colored safety vests should be worn by all crew members during flushing

- Because most valves are in the street, one crew member should be controlling traffic while the other member(s) is operating distribution system valves.

- Traffic signs, cones, flags, and/or vehicles with warning lights should be used as necessary to divert traffic around flushing activities

- Keep the public away from ongoing flushing activities. Children are attracted to such activities and are vulnerable to injury.

- Open hydrant valves completely to prevent water discharging through the barrel drain at pressure, undermining the hydrant support

- Open and close hydrants and valves slowly to prevent the development of dangerous pressure surges

- Use well-restrained energy dissipaters for hydrant flushing to prevent damage to private and public property

- Discharge flushing water directly to a sanitary or storm sewer whenever possible to avoid flooding of streets and underground electrical vaults. Where street flooding is unavoidable, use signs, flags, and other items to direct traffic appropriately



### 2.1.3    Implementation

Successful implementation of a flushing program is contingent upon careful planning and staff preparedness. Ideally, valves and hydrants involved in the program should be exercised prior to flushing to minimize interruptions during program implementation. Flushing crew members should be properly trained and equipped. A general tool list for flushing is presented in Table 2-3.

**Table 2-3: Equipment List for Flushing**

| Equipment Needed |
| --- |
| • Traffic cones |
| • Warning signs |
| • Stillson wrenches |
| • Adjustable wrenches |
| • Spanner wrenches |
| • M.J. wrenches |
| • Socket set |
| • Gate valve keys |
| • Hydrant adaptors |
| • Two-way radios |
| • Street broom |
| • Shovel |
| • Hammers |
| • Spare Hydrant Caps |
| • Hydrant Flow Diffuser |

### 2.1.4    Flushing Procedures

The flushing procedure can be found in Appendix C.

### 2.1.5    Data Collection

WJWW's data collection program allows operators and managers to determine whether flushing objectives are being met and to assess secondary effects that may have occurred as a result of flushing. The field data collection form can be found in Appendix C.



## 2.2  RESULTS EVALUATION

Following the completion of flushing, WJWW staff evaluate the data collected before and during flushing. Data analysis enables WJWW to refine the flushing program, reduce costs and water use, and achieve the desired water quality improvements. WJWW may make modify system operations based on analysis results.



# APPENDIX A:    SAMPLE PUBLIC NOTICE

The following Public Advertisement will be posted on WJWW's website prior to flushing:

Hydrant flushing will begin during the late night hours of [DAY], [DATE] and is expected to continue through [DAY], [DATE]. Hydrant flushing will be done around-the-clock Monday through Friday during this period. Localized, temporary water discoloration is possible during and following hydrant flushing. If you should experience discolored water conditions, do not use hot water or do laundry while the condition lasts. To clear the condition, run cold water on the lowest level of your home for several minutes until the water runs clear. While discolored water is not aesthetically pleasing, it is safe to use and drink. Updates will be posted on our website wjww.com and notifications via phone and/or e-mail will be provided just prior to hydrant flushing being done in a particular area. The Westchester Joint Water Works thanks you for your patience and cooperation while we work to provide high water quality and reliable service.



# APPENDIX B:    FREQUENTLY ASKED QUESTIONS

**Q. What is water system flushing?**

**A.**   Water system flushing systemically flushes the water pipes to remove sediment and improve water quality. Fire hydrants are opened and water is flushed through the lines at high speeds, cleaning the pipes and removing the sediments that can affect the taste and color of drinking water.

**Q. Why is flushing needed?**

**A.** Flushing the water pipes removes sediment and improves water quality. Without regular flushing, sediment can build up in the pipes and affect the quality—especially the taste and color—of the drinking water. The flushing pushes water through the pipes at high speeds, cleaning the pipes and removing sediment.

**Q. Is Flushing a Waste of Water?**

**A.** The amount and cost of water used in flushing is a small price to pay compared to benefits of assuring the quality of your water and maintaining our infrastructure.

**Q. When does the flushing process take place?**

**A.** Westchester Joint Water Works flushes the water distribution system throughout the year as needed to meet water quality goals. The next round of flushing will be done Monday through Friday XX am to XX pm from DATE to DATE.

**Q. When will crews be flushing in my neighborhood?**

**A.** Approximate flushing dates by neighborhood can be viewed on Westchester Joint Water Works' website. Additionally, dates and location of flushing will be posted in the affected neighborhood. For more specific information, contact the Westchester Joint Water Works office at:

Westchester Joint Water Works
1625 Mamaroneck Ave
Mamaroneck, NY, 10543
Telephone: 914-698-3500



**Q. How will my water service be affected?**

**A.** You may experience low-water pressure as a result of flow being redirected so that pipes can be isolated for flushing. However, your water service should not be interrupted. During this time, your water may be cloudy or appear discolored. Water system flushing will not correct private plumbing or corrosion problems. If you experience NO water pressure, please contact Westchester Joint Water Works at (914) 698-3500

**Q. Can I use my water while crews are flushing in my neighborhood?**

**A.** Please minimize water use while crews are in your neighborhood. To avoid the risk of drawing sediments into your hot water tank, do not use any hot water. Avoid doing laundry during this time as the sediments in the water may cause stains.

**Q. Is my water safe to drink?**

**A.** Yes, while the sediments that get stirred up may not be aesthetically pleasing and can cause the water to discolor and stain laundry, they are not harmful. The sediments may cause your water to appear cloudy.

**Q. What should I do if my water is cloudy and discolored after the flushing is completed?**

**A.** If you experience cloudy or discolored water after the flushing is completed, let your cold water faucet run for 5-10 minutes. If it doesn't clear in that time, wait 30 minutes and try again. If you have an aerator or filter on your faucet, it is a good idea to remove it, and put it back on when the water clears. Running the water in the bathtub increases the flow and provides a light background to check for clarity.

**Q. What should I do if the water stains my laundry?**

**A.** Before drying the clothes, rewash them when both the cold and hot water are clear. Non-chlorine bleach (such as Clorox II) may be used to help remove the stains. Don't use chlorine bleach as it will make the stains more difficult to remove.

**Q. How long will this program last in my neighborhood?**

**A.** The length of time required to flush the water lines varies with each neighborhood, depending on the size of the pipes and how much sediment they contain. A flushing map showing areas with approximate flushing periods for each area can also be found on the WJWW website.



**Q. Are there other benefits to water system flushing?**

**A.** In addition to helping deliver higher quality drinking water by removing sediments, flushing is used to assess the condition of the distribution system. Flushing also provides an opportunity to inspect the fire hydrants for operation and safety.



# APPENDIX C:  FLUSHING FIELD FORMS

**Table D-1: Field Protocol, Procedures, and Documentation**

| PRECAUTIONS,  INITIAL CONDITIONS AND PREPERATION | | |
|---|---|---|
| **Step** | **Description** | **Action** |
| 1 | Contamination | **NEVER** flush water to the environment that is contaminated. **NEVER** discharge water from the distribution system to the environment if the type and amount of contamination is unknown. |
| 2 | Notification | Notify tenants and departments of the flushing in their area.  The flushing process can disturb sediments in the piping, discoloring the water and soiling laundry.<br><br>Notify the fire department and keep them in direct radio contact with the flushing crew.  In the event of a fire, the flushing program should be suspended immediately. |
| 3 | Equipment | • Adjustable hydrant spanner<br>• Diffuser<br>• Traffic cones/barriers and Safety vests<br>• Hydrant wrenches and keys for valves<br>• Field journal or other means of recording data<br>• Water distribution system maps |



| GENERAL FLUSHING PROCEDURE | | |
|---|---|---|
| **Step** | **Description** | **Action** |
| 1 | Safety | Ensure required safety measures are in place. |
| 2 | Flushing | Review the system drawings to identify the hydrants to use for flushing the system. It is best to flush from the source of the water to the outer reaches of the system. Start with the largest mains and end with the smaller laterals. Forcing the water to flush in one direction ensures that pipes are always being flushed with clean water. |
| 3 | Isolation Valves | When closing the isolation valves specified in the flushing program, be sure to close them slowly to prevent water hammer. After a line has been sufficiently flushed, most isolation valves that were closed must be reopened. Fully open the valves, and then back them off ¼ of a turn so they do not stick in the open position. |
| 4 | Hydrants | When operating hydrants, open them fully during flushing, and close slowly to prevent water hammer. |
| 5 | Ditches and Drains | Ensure ditches, drains, and flow paths are free from leaves and debris and will adequately carry off discharged water. |
| 6 | Calculate Flow | Calculate the flow rate at each hydrant by following the Step-by-Step Flushing Procedure and Flow Calculation Procedure below. |
| 7 | Documentation | Document the flushing event using the attached Flushing Log Sheet. |

| STEP-BY-STEP FLUSHING PROCEDURE | | |
|---|---|---|
| Step | Description | Action |
| 1 | Safety Measures | Verify that operators working in streets have proper visibility attire. Set up traffic signs, cones, flags, and/or vehicles as needed to divert traffic around flushing activities. |
| 2 | Complete Worksheet | Record the flushing activity including the coefficient of discharge for the diffuser using the attached Flushing Log Sheet. |
| 3 | Check Flow Path | Identify the flow path that water would take after the hydrant is opened. Remove any debris or other obstructions from the flow path. |
| 4 | Flow Hydrant | Attach a pressure gauge and diffuser to the flow hydrant. Open the valve slowly and completely. |
| 5 | Static Pressure | Turn on the valve to the gauge and record the static pressure reading. |
| 6 | Test Hydrant | Attach a pressure gauge to the test hydrant or nearby hose bib. |
| 7 | Static Pressure | Turn on the test hydrant or hose bib and record the static pressure reading.  We are interested in the pressure reading with and without the flow at the test hydrant.  The static readings taken at the flow hydrant and test location should be the same, plus or minus about a half pound per foot of elevation difference. |
| 8 | Open Outlet | Completely open the outlet to which the diffuser is attached. |
| 9 | Record Pitot Reading | Take and record a pitot reading by inserting the pitot gauge into the center of the column of water flow. The inlet for the gauge should be placed a distance away from the opening equal to the diameter of the opening. |
| 10 | Residual Pressure | Take and record the residual pressure on the flow hydrant cap gauge or at the test hydrant or hose bib. |
| 11 | Calculate Flow | Calculate the flow and continue flushing the line until the water flows clear.  The flow calculation is described in detail in the table below. |
| 12 | Close Outlet | When the water runs clear close the flow hydrant slowly being careful not to cause a "water hammer" and spike the pressure on the cap gauge above the normal static pressure. |
| 13 | Verify Closure | Verify that all valves are closed properly, are not seeping or leaking, and that the hydrant is ready for service.  Additionally, at the end of every flushing zone, verify that all valves closed during flushing have been re-opened using the attached Valve Opening Verification Log. |
| 14 | Demobilize | Remove all maintenance and protection of traffic measures from the site. |



## Table D-2: Field Log Sheet

| Background | |
|---|---|
| Flow Hydrant Number | |
| Description of Location | |
| Date | |

| | | | |
|---|---|---|---|
| Start Time | | Stop Time | |

| | |
|---|---|
| Testers | |
| Reason for Flushing | |

| Flow Test Readings | |
|---|---|
| **Flow Hydrant** | |
| Hydrant Condition | |
| Outlet Diameter | inch |
| Flush Rate (Q) | gpm |
| Pitot Pressure | psi |
| Time to clear | min |
| Estimated Water Use (time $\times$ Q) | gal |

**Comments:**

**APPENDIX C**

**Source Water Monitoring Plan**

**Westchester Joint Water Works – LT2 Second Round Source Water Monitoring Plan**
**December 2023**

**PWS ID.:** NY5903435

**Facility ID.:** Rye Lake Pump Station

**Sampling Location**: Rye Lake Pump Station Raw Water Sample Tap - WJWW's existing sample location for all raw water source samples

**Source type:** Surface Water / Reservoir

**Sample collection date:**

| Event # | Date | MS* | Event # | Date | MS* |
|---------|------|-----|---------|------|-----|
| 1 | 1/3/2024 | MS | 13 | 1/8/2025 | |
| 2 | 2/7/2024 | | 14 | 2/5/2025 | |
| 3 | 3/6/2024 | | 15 | 3/5/2025 | |
| 4 | 4/3/2024 | | 16 | 4/2/2025 | |
| 5 | 5/1/2024 | | 17 | 5/7/2025 | |
| 6 | 6/5/2024 | | 18 | 6/4/2025 | |
| 7 | 7/3/2024 | | 19 | 7/2/2025 | MS |
| 8 | 8/7/2024 | | 20 | 8/6/2025 | |
| 9 | 9/4/2024 | | 21 | 9/3/2025 | |
| 10 | 10/2/2024 | | 22 | 10/1/2025 | |
| 11 | 11/6/2024 | | 23 | 11/5/2025 | |
| 12 | 12/4/2024 | | 24 | 12/3/2025 | |

*MS = Field sample and Matrix Spike sample are collected on the date indicated.

**Sampling type:**
1. Cryptosporidium/10 L
2. E. Coli/100 mL.
3. Turbidity/100 mL
4. PH (Field Collected)
5. Temperature (Field Collected)

**Laboratory:**
1. Cryptosporidium (Only):
   ANALYTICAL SERVICES, INC. (ASI)
   Microbiological Testing, Research and Consulting
   130 Allen Brook Lane, Williston, VT 05495
   800.723.4432 / 802.878.5138
   www.analyticalservices.com

2. E.Coli & Turbidity:
   Westchester County Laboratories and Research
   10 Dana Road, Valhalla, NY 10595
   914.231.1620 / 914.231.4458

**Reporting Source Water Monitoring Results:** Results will be reported in accordance with § 141.701 no later than 10 days after the end of the first month following the month when the sample is collected.

Report Results will be submitted electronically to the USEPA, NYSDOH and Westchester County DOH



# APPENDIX D

## SEP Memo



August 17, 2023

To:     Paul Kutzy, PE – Manager, Westchester Joint Water Works

From:   Eileen Feldman, PE – Hazen and Sawyer

Re:     **WJWW Potential Supplemental Environmental Project for Proposed Consent Decree:**
        **Extended Detention Basin Modifications on NYCDEP Property**

## Project Summary

An existing 0.5-acre extended detention basin on NYCDEP property between I-684 and Purchase Street discharges directly into the Rye Lake portion of Kensico Reservoir, as shown in **Figure 1**. This stormwater management facility was one of 45 Best Management Practices installed by NYCDEP in the late 1990s. These have been effective in decreasing the fecal coliform and turbidity loading to Kensico Reservoir. Though this site has been maintained regularly by NYCDEP, there are some potential modifications that could enhance the water quality protection benefits of this facility. The proposed project includes modifications to the existing basin, as follows:

- Replacement of V-notch weir plate to raise the elevation and increase volume of the extended detention basin;
- Regrading or removal of existing sediments to increase volume within the extended detention basin; and
- Invasive species management.

The V-notch weir on the existing outlet of the extended detention basin is a metal plate attached to a larger, rectangular concrete weir, as shown on **Figure 2,** below. The metal weir plate can be replaced without significant modifications to the concrete structure. During a recent site visit, there was no evidence on the staff gauge that the water surface had exceeded the height of the rectangular weir, thereby suggesting the existing outlet elevation and associated V-notch weir could be increased.

Preliminary discussions with NYCDEP, the owner of the extended detention basin, have been initiated regarding this proposed project.



August 17, 2023



**Figure 1: Location of Proposed Project**





**Figure 2: Existing Extended Detention Basin Outlet Weir**

## Nexus/Environmental Benefits

The anticipated environmental benefits of these modifications will be to reduce turbidity and natural organic matter entering the Kensico Reservoir near WJWW's intake. This project is anticipated to decrease sediment, nutrients, and natural organic matter inputs to Kensico Reservoir through increased stormwater volume control that would decrease water velocity and promote setting. Natural organic matter is a precursor to disinfection byproducts (TTHM and HAA5). By reducing natural organic matter in WJWW's water supply, the project will help WJWW lower the concentration of disinfection byproducts in its water.

## Anticipated Permits and Approvals

This project is anticipated to require permits and/or approvals from the following agencies:

- Property Owner: New York City Department of Environmental Protection (NYCDEP)
- US Army Corps of Engineers
- Federal Aviation Administration (FAA)
- New York State Department of Environmental Conservation (NYSDEC)
- New York State Watershed Inspector General
- New York City Department of Environmental Protection
- Town/Village of Harrison



August 17, 2023

## Estimated Budgetary Costs

Estimated costs developed for the proposed project are provided in **Table 1**:

**Table 1: Estimated Costs for Extended Detention Basin Modifications on NYCDEP Property**

| Cost Type | Item | Unit | Estimated Cost |
|---|---|---|---|
| Construction | Modifications to Extended Detention Basin (west of Route 120) | --- | $750,000 |
| | Contingency* | --- | $100,000 |
| Professional Services | Engineering, Permitting, Construction Inspection, and Legal Services | 17.5% of Construction Costs | $150,000 |
| **Total Estimated Cost** | --- | --- | **$1,000,000** |

*Additional construction contingency (as presented in our memorandum dated May 24, 2023 titled "Extended Detention Basin Modifications on NYCDEP Property") may be required pending site conditions and engineering design of regrading and invasive species management.

The construction costs presented below are based on similar projects recently bid in New York State. They include disposal of soils, regrading, invasive species removal, new plantings, weir plate replacement, and associated testing and sampling.

Due to the preliminary planning stage of this proposed project, a contingency of $100,000 is included, but once site conditions and unit costs and quantities of improvements are identified (e.g., quantity of regrading, extent of invasive species management), the contingency amount could increase depending on these conditions, potentially on the order of 50% of construction costs.

Engineering, permitting and legal services are estimated at 17.5%. A typical industry estimate for engineering, permitting and inspection services is between 10-15% of the construction costs. Legal costs are typically estimated at 5% of construction costs.

Operations and maintenance effort will be comparable to what is currently being performed at the site, so no additional costs are anticipated for this work.

As this project is further defined, the cost estimate can be updated with more detailed cost information.

## Preliminary Implementation Schedule

**Table 2** provides a preliminary implementation schedule for the Extended Detention Basin Modifications project. It is estimated that the project will take on the order of 4.5 years to complete.



August 17, 2023

**Table 2: Preliminary Implementation Schedule**

| Task | Duration | Year 1 | | | | Year 2 | | | | Year 3 | | | | Year 4 | | | | Year 5 | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 |
| Establish Preliminary Design | 3 mon | ▓ | | | | | | | | | | | | | | | | | | | |
| Obtain Concept Concurrence with NYCDEP | 6 mon | | ▓ | ▓ | | | | | | | | | | | | | | | | | |
| Conduct Field Investigations | 6 mon | | | | ▓ | | | | | | | | | | | | | | | | |
| Perform Detailed Design | 6 mon | | | | | | ▓ | ▓ | | | | | | | | | | | | | |
| Permitting and Legal Review | | | | | | | | | | | | | | | | | | | | | |
| Obtain SWPPP Approval from NYCDEP | 12 mon | | | | | | | | | ▓ | ▓ | ▓ | | | | | | | | | |
| Obtain NYSDEC and Local Permits | 12 mon | | | | | | | | | ▓ | ▓ | ▓ | | | | | | | | | |
| Legal Review by NYCDEP | 12 mon | | | | | | | | | ▓ | ▓ | ▓ | | | | | | | | | |
| Bidding and Award | 3 mon | | | | | | | | | | | | ▓ | | | | | | | | |
| Construction | 18 mon | | | | | | | | | | | | | ▓ | ▓ | ▓ | ▓ | ▓ | ▓ | | |
| **Total Duration** | **4.5 yrs** | | | | | | | | | | | | | | | | | | | | |

Page 5